777 So.2d 225 (1998)
Gary DRINKARD
v.
STATE.
CR-95-0055.
Court of Criminal Appeals of Alabama.
December 18, 1998.
Rehearing Denied January 15, 1999.
*234 Britt Cauthen, Decatur; Kimberly J. Dobbs-Ramey, Decatur; and Randall Scott Susskind, Montgomery, for appellant.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
BROWN, Judge.
The appellant, Gary Drinkard, was convicted of the offense of murder made capital because it was committed during a robbery in the first degree, see § 13A-5-40(a)(2), Code of Alabama 1975. He waived his right to a sentencing hearing before the jury that convicted him. Following a sentencing hearing before the trial court, the appellant was sentenced to death.
In its sentencing order, the trial court set out the following findings of fact:
"Dalton Pace, the 62-year-old victim of this crime, lived on Old Moulton Road in Decatur where he operated a vehicle parts business and junkyard out of his home. Pace had a reputation for carrying large amounts of cash on his person. According to his former wife, who handled Pace's business banking and paperwork, he carried three rolls of cash: one to buy trucks and parts, one to make change for customers and one to be deposited in the bank when it accumulated to $2,000. He also regularly carried ten $100 bills in his wallet.
"About 4:30 p.m. on August 18, 1993, Pace's son stopped by to assist his father in removing an engine from a truck. He observed a large `wad' of cash in his father's shirt pocket. That same day, Perry Davis bought a truck motor from Pace. He paid $550 for the motor and saw Pace put the cash in the front pocket of his pants.
"Between 9:00 and 10:00 on the evening of August 18, Pace's next-door neighbor, Buster Smith, heard a banging sound coming from the vicinity of Pace's home. Smith paid no particular attention because his neighbor was always slamming doors and sometimes shooting his guns. Smith later heard a car make a sound like spinning gravel and saw a 1976 to 1978 model Ford LTD speed by the front of his home. The vehicle's rear taillight on the driver's side did not work.
"At about 4:30 p.m. on August 19, 1993, one of Pace's friends found him lying dead on the floor of his home. Police investigators found 40 cents in one of Pace's pockets and his wallet containing ten $100 bills in another. There was no other cash on Pace's body or at the crime scene. The investigators also recovered a .45 caliber bullet casing near Pace's body and another in the kitchen of his home.
"Dalton Pace suffered three gunshot wounds: one in his chest and two in his backall three of which were lethal. The medical examiner recovered a bullet fragment from the victim's body. Analysis of this fragment and the shell casings found at Pace's home disclosed that a .45 caliber ACP type revolver fired all three bullets. This type of weapon included a Smith & Wesson .45 caliber ACP revolver.
"In July 1993, Robert James Fayard sold the defendant, Gary Wayne Drinkard, a .45 caliber Smith & Wesson Coltstyle revolver with a circle clip which *235 held three bullets. Between a month to two weeks before Pace's death, Rex Segars saw a .45 caliber Colt-style revolver in the defendant's possession and actually fired it. After his arrest for killing Pace, the defendant told Robert Fayard to say that he had sold him a .45 caliber revolver frame that had a .38 caliber barrel or that shot .38 caliber bullets.
"Six to eight weeks before Pace's death, the defendant told Rex Segars in a conversation overheard by the defendant's half-sister, Beverly Robinson, that he knew where to get some easy money. As Robinson recalled the conversation, the defendant said an old man named Dalton Pace ran a junkyard and kept a wad of money on him. A few weeks later, Robinson and Segars ran into the defendant who again stated they could get the money easy. He asked Segars if he wanted to go in on it.
"Rex Segars testified that in the first conversation on this subject, the defendant said he knew a guy who owned a junkyard in Decatur and kept a large amount of money. The defendant described the man as `a big old S.O.B.' who would have to be killed to get his money. In a later conversation about a month before Pace's death, the defendant told Segars basically the same thing and repeated that he was thinking about robbing Pace but would have to kill him.
"According to Michael Riggs, who worked for the defendant in the summer of 1993, his boss told him in about early July that he knew where `somebody could make a good lick.' The defendant stated that an old man who was a junk dealer on Highway 24 kept a good bit of money on him. But, according to the defendant, a person would have to kill `the S.O.B.' because he would not give up his money. Riggs described the defendant as appearing serious and coldhearted when this conversation took place.
"The night after Pace was robbed and murdered, the defendant told Rex Segars that he shot the victim three or four timesonce in the front and three more times in the backbut he was still alive. The defendant worried that Pace had survived and asked Segars if he knew where he could get a `hot' pistol so he could go to the hospital and finish him off. According to the defendant, he got only $2,200 from robbing Pace. He also stated that the victim had grabbed his arm and tore his sleeve. Segars saw what appeared to be claw marks on the defendant's side.
"Between his arrest on August 28, 1993, on a marijuana possession charge and his arrest on September 1, 1993, for the capital murder of Dalton Pace, the defendant told Beverly Robinson and Rex Segars that he was not worried about the police catching him because they had no money, fingerprints, eyewitnesses or gun. At the time of his arrest, the police found in the trunk of the defendant's 1978 Ford LTD a broken left rear taillight assembly which was on the vehicle at one time."
(C.R.62-65.)
At the outset, we note that the appellant raises some 29 issues on appeal, several of which include numerous subparts, and, in a practice disfavored by this Court, he also raises several substantive issues in footnotes. Many of the appellant's assertions have not been preserved for appellate review; nevertheless, because this case involves the death penalty, this Court must review the appellant's assertions for plain error.
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, Ala.R.App.P.
"In considering what constitutes plain error in a capital case, we have adhered *236 to the interpretation of the term `plain error' adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991)."
Bush v. State, 695 So.2d 70, 87 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). See also, Davis v. State, 718 So.2d 1148, 1154 n. 3 (Ala.Cr. App.1995), aff'd, 718 So.2d 1166 (Ala.1998).

I.
The appellant contends that the trial court erred in refusing to sequester the jury during his trial. Specifically, he argues that Rule 19.3(a)(1), Ala.R.Crim.P., takes precedence over § 12-16-9, Code of Alabama 1975, and therefore, the trial court erred in allowing the jury to separate over the objection of the parties.[1] This Court recently addressed this issue and decided it adversely to the appellant in Stewart v. State, 730 So.2d 1203, 1212 (Ala. Cr.App.1997). See also, Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998); Smith v. State, on return to remand, 756 So.2d 892 (Ala.Cr.App.1997). Accordingly, this argument is without merit.

II.
The appellant claims that the trial court erred in denying his motion to dismiss the indictment based on his allegation that the manner of selecting grand jury forepersons in Morgan County was racially discriminatory. We disagree.
The appellant filed a motion to dismiss the indictment in which he argued, in part, that African-Americans had been "systematically and discriminatorily excluded from serving as grand jury foreperson in Morgan County."[2] The trial court subsequently *237 conducted a hearing on the appellant's motion.
Testimony elicited at the hearing established that before October 1993 grand jury forepersons were appointed by the trial court based upon a recommendation from the district attorney. The evidence tended to indicate that at the time of the hearing, no African-American had served as a foreperson of a grand jury in Morgan County. Bob Burrell, the district attorney for Morgan County since 1987, testified that since October 1993 the grand jury members have been allowed to select a foreperson from among themselves. The grand jury that indicted the appellant selected its own foreperson. (R. 629-30.) According to Burrell, the new method has not yet resulted in the selection of an African-American as a grand-jury foreperson; however, he testified that African-Americans make up only approximately 10% of Morgan County's population and that consequently, there are usually very few African-Americans on any grand jury.
At the conclusion of the hearing, the trial court made the following findings:
"All right. Having listened to the testimony and your argument in the case, of course, the burden is on you to establish a prima facie case of discrimination. I think there are probably three factors that have to be shown. Number one, that has been a distinct class against whom discrimination has been practiced. Number two, that the degree of under representation by comparing to the population has been significant over a period of time, and that the selection process is either susceptible to abuse or it's not racially neutral. In this particular case, the testimony from the district attorney is uncontroverted that the grandthat the foreperson of this grand jury was selected by the grand jurors themselves without pressure or influence or interference from anybody. While the practice prior to that might not have been all that desirable and I suppose might even be suspect, I don't find that the selection procedure that was followed in this particular instance was either susceptible to abuse or was not racially neutral. So I find that there has not been a prima facie case of discrimination established, and I'm going to deny your motion to dismiss the indictment."
(R. 641-42.)
The appellant argues that the trial court erred in denying his motion to dismiss the indictment. Specifically, he claims that he "presented evidence showing that the current method of selecting the grand jury foreperson in Morgan County unquestionably violates the Equal Protection Clause and [his] rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law." (Appellant's brief, p. 10.) In support of his assertion, he relies primarily on the case of Pace v. State, 714 So.2d 316 (Ala.Cr.App. 1995), opinion after remand, 714 So.2d 320 (Ala.Cr.App.1996).
In Pace, a capital murder case, the defendant filed an untimely motion to dismiss his indictment on the ground that the selection of grand jury forepersons in Morgan County was racially discriminatory. The trial court denied the motion without a hearing. This Court found that the defendant had shown a prima facie case of racial discrimination in the selection of the grand jury forepersons, and we remanded the case to the trial court with instructions that the trial court conduct a hearing on the defendant's motion to dismiss.
On return to remand, we found:

*238 "To prove a prima facie case of discrimination in the selection of grand jury forepersons a petitioner must show: 1) that the group alleged to be discriminated against is a distinct group; 2) that the degree of underrepresentation is significant over a period of time; and 3) that the selection procedure is susceptible to abuse or is not race-neutral. Lee v. State, 631 So.2d 1059, 1060 (Ala.Cr. App.1993), and Locke v. State, 631 So.2d 1062 (Ala.Cr.App.1993). See also Johnson v. Puckett, 929 F.2d 1067, 1071 (5th Cir.), cert. denied, 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991).
"At the hearing on remand, the testimony established that blacks comprised a distinct group in Morgan County. Testimony also established that since 1927, the date a record of grand jury proceedings was first kept, no black had ever served as foreperson for a Morgan County grand jury. Testimony also established that the grand jury forepersons were chosen by the judge who presided over grand jury selection on the advice of the district attorney's office. Several judges testified that it was their practice to ask the district attorney who to appoint as grand jury foreperson or, in a few instances, to have the district attorney approve of the name they selected. There is absolutely no question here that a prima facie case of discrimination was proven. The trial court in its order denying the motion agreed."
714 So.2d at 323.
The trial court found that the state had rebutted the prima facie case. This Court disagreed. We explained:
"What the trial court failed to consider when relying on [U.S. v.] Perez-Hernandez [672 F.2d 1380 (11th Cir.1982)] was the fact that the district attorney in Morgan County recommended to the trial court the person he wanted the trial court to select as grand jury foreperson. The situation that existed in this case is not analogous to the situation in Perez-Hernandez, where the judge, without outside advice, selected the grand jury foreperson.
"In this case, the judge did not `alone' select the grand jury foreperson. The witnesses called in this case testified that they could not remember one instance when the trial court did not follow the recommendation of the district attorney. The individuals called to testify, a great many of whom were former district attorneys, stated that they picked the grand jury foreperson on the basis of whether they knew the person and whether that person had a good reputation in the community. One witness, a former district attorney and a former judge in Morgan County, admitted that the criteria he used when recommending a grand jury foreperson to the court was subjective. Of course, selection by the district attorney is inherently suspect because unlike the judge, the district attorney is not a neutral court official, but is instead an arm of the sovereign that will prosecute the individual once he or she is indicted by the grand jury.
"As the Fifth Circuit Court of Appeals stated in Johnson v. Puckett, 929 F.2d 1067, 1073 (5th Cir.), cert. denied, 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991):
"`This court has required that testimony rebutting a prima facie case of discrimination establish the use of objective, racially neutral selection procedures. The rebuttal testimony offered by the State, by contrast, merely indicates that the judges in Panola County never stated or indicated to the circuit clerk that they selected grand jury foremen based on their race; the testimony neither denied the use of racial criteria nor advanced any other objective non-discriminatory criteria used by the judges. This evidence is inadequate to rebut the presumption of discrimination *239 established by petitioner's prima facie case.'
"As stated above, there was no objective standard employed by Morgan County to select a grand jury foreperson. The selection was, in effect, made by the district attorney. The district attorney's motivation is not at issue here.
"Of significance is the fact that the method of selecting grand jury forepersons in Morgan County was changed after the appellant was indicted. The current method is to select the grand jury and then allow the grand jury members to select a foreperson. The current system used in Morgan County may also be subject to abuse given the fact that whites comprise a higher percentage of the population in Morgan County than blacks. Therefore, the current method may well violate the third prong of Lee and Locke and result in discrimination."
714 So.2d at 324-25. This Court held that "[t]he indictment against the appellant should have been dismissed because of discrimination in the selection of the grand jury foreperson in Morgan County," 714 So.2d at 325, and we reversed the judgment of the trial court.[3]
The appellant relies heavily on Pace in support of his assertion that the trial court erred in denying his motion to dismiss; however, during the pendency of the appellant's appeal, the Alabama Supreme Court issued its opinion in Pace v. State, 714 So.2d 332 (Ala.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998).
In Pace, the Alabama Supreme Court granted the State's petition for certiorari review in order to resolve the question whether discrimination in the selection of a grand jury foreperson constitutes plain error, a question which, the Alabama Supreme Court found, had not been clarified in this court's opinions. We quote extensively from Justice Butts's opinion:
"A.
"We take guidance from two landmark opinions from the United States Supreme Court that discussed discrimination in the selection of grand jury forepersons. In Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the Supreme Court assumed, without deciding, that discrimination in the selection of a grand jury foreperson from among the members of the grand jury violates a criminal defendant's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and requires that a conviction be set aside. However, several years later, in Hobby v. United States, 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), the Supreme Court held that discrimination in the selection of a federal grand jury foreperson did not violate the Due Process Clause of the Fifth Amendment. The Supreme Court stated that when the role of a grand jury foreperson is merely ministerial in nature, `discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness.' 468 U.S. at 345, 104 S.Ct. at 3096-97. In discussing the Rose opinion, the Hobby Court noted that the role of the Tennessee grand jury foreperson at issue in Rose differed substantially from the ministerial role of a federal grand jury foreperson in that the Tennessee foreperson is charged with substantial power, including the duty to assist the district attorney in investigating the crime and the privilege of a virtual veto over the indictment process. The Hobby Court distinguished Rose as follows:

*240 "`Given the nature of the constitutional injury alleged in Rose [equal protection], the peculiar manner in which the Tennessee grand jury selection operated, and the authority granted to the one who served as foreman, the Court assumed in Rose that discrimination with regard to the foreman's selection would require the setting aside of a subsequent conviction, "just as if the discrimination proved had tainted the selection of the entire grand jury venire." Rose v. Mitchell, 443 U.S., at 551-552, n. 4 [99 S.Ct. at 2997-2998, n. 4]. No such assumption is appropriate here, however, in the very different context of a due process challenge by a white male to the selection of foremen of federal grand juries.'
"468 U.S. at 349, 104 S.Ct at 3098. Thus, while Rose held that discrimination in the selection of a grand jury foreperson is an equal protection violation, Hobby held that such discrimination is not a due process violation where the role of the foreperson is ministerial.
"In Lee [v. State, 631 So.2d 1059 (Ala. Cr.App.1993)], supra, the Court of Criminal Appeals noted the holding in Hobby, but stated: `The argument that a black defendant's due process rights were not violated because the grand jury foreman's responsibilities were largely ministerial was rejected in Johnson [v. Puckett], 929 F.2d [1067] at 1071 [(5th Cir.), cert. denied, 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991)].' 631 So.2d at 1061. This Court granted a petition for the writ of certiorari, to review the Lee opinion, but later quashed the writ as having been improvidently granted. Given today another opportunity to review Lee, we overrule it, for the reason explained below, to the extent that it holds that a criminal defendant's due process rights are violated by racial discrimination in the selection of a grand jury foreperson from a properly constituted Alabama grand jury.
"In this state, the function of a grand jury foreperson is almost entirely ministerial in nature, very similar to that of a federal grand jury foreperson. See Noah v. State, 494 So.2d 870 (Ala.Cr. App.1986). Thus, as the United States Supreme Court held in Hobby, if there is no discrimination in the selection of the members of the grand jury, any discrimination in the selection of a foreperson from among those members can have no more than an incidental effect on the defendant's due process right and does not rise to the level of a violation of that right. We conclude that the Court of Criminal Appeals misinterpreted Johnson, which specifically dealt with an allegation of violation of a defendant's right to equal protection of the laws, not his right to due process. Thus, Johnson cannot be relied on for the proposition for which the Court of Criminal Appeals cited it in Lee.

"B.
"The voluminous record of this case discloses that the Court of Criminal Appeals correctly held that Pace has proven that Morgan County engaged in a lengthy history of racial discrimination in selecting grand jury forepersons, including the foreperson of the grand jury that indicted him. Thus, based on the United States Supreme Court's opinion in Rose, and following the reasoning of the Court of Criminal Appeals in Lee and Locke [v. State, 631 So.2d 1062 (Ala. Cr.App.1993)], we conclude that Pace's constitutional right to equal protection was violated. However, as we have noted above, because Pace failed to make a timely motion to quash his indictment on that basis, the `contemporaneous objection rule' does not apply, and we must determine whether the equal protection violation raised by Pace rises to the level of `plain error' under Rule 39(k), Ala. R.App.P.
"After thorough consideration, we conclude that it does not. We addressed *241 this issue to a certain extent in Ex parte Robin Myers, 699 So.2d 1285 (Ala.1997); in that case, the defendant Myers, who was sentenced to death for capital murder, had been indicted by a Morgan County grand jury seven months before Pace was indicted by a Morgan County grand jury. Myers argued for a reversal of his conviction and a dismissal of his indictment, based on the Court of Criminal Appeals' opinion in Pace, supra. We stated in Ex parte Myers:
"`The record is silent with respect to the racial composition of the grand jury that returned the indictment against Myers. In effect, by relying on Pace, Myers is requesting that we dismiss the indictment against him based on an intermediate appellate court's nonfinal holding that is now pending before this Court on certiorari review. We decline this request, "for to [accept it] would unduly enlarge the scope of the plain error review as authorized by our appellate rules." Ex parte McNair, [653 So.2d 353, 360 (Ala.1994)]; see, also, Ex parte Watkins, 509 So.2d 1074 (Ala. 1987). We find nothing in the record that would justify a dismissal of the indictment.'
"Myers, 699 So.2d at 1296 (footnote omitted). However, in a footnote in Myers, this Court noted the United States Supreme Court's opinions in Rose and Hobby and stated, in dicta, that `a review under the plain error rule, which guarantees a defendant a fundamental right to fairness, is tantamount to a due process review.' Id. at 1298, n. 4. In further dicta based on Hobby, we concluded that any discrimination in the selection of the foreperson of Myers's grand jury did not rise to the level of plain error, because Myers had not shown that the grand jury was itself improperly constituted and because the role of a grand jury foreperson in Alabama is primarily ministerial. Id.

"We now hold what we implied in Myersthat if there was no discrimination in the selection of the members of a particular grand jury, then racial discrimination in the selection of a grand jury foreperson from among the members of that properly constituted grand jury may be a violation of a criminal defendant's equal protection rights, but it is not `plain error' that mandates reversal of a capital murder conviction in a case in which the defendant did not make a timely motion to quash the indictment. As we noted above, an error is not `plain error' unless a failure to reverse the defendant's conviction on the basis of that error would be a `miscarriage of justice.' See United States v. Young, 470 U.S. at 15, 105 S.Ct. at 1046. Because the role of an Alabama grand jury foreperson is almost entirely ministerial, we conclude that discrimination in the selection of the foreperson of the otherwise properly constituted grand jury that indicted Pace did not deprive him of a fundamentally fair grand jury hearing or of a subsequent fair trial.

"First, the discriminatory selection of the foreperson in this case did not impact the integrity of the indictment process through the composition of the grand jury panel. Unlike the Tennessee grand jury foreperson in Rose, the grand jury foreperson selected in this case was selected from among a panel of impartially chosen grand jurors. Thus, like the selection of federal grand jury forepersons in Hobby, the selection of the foreperson in this case did not change the composition of the grand jury venire. See 443 U.S. at 548, n. 2, 99 S.Ct at 2996, n. 2. Thus, Pace could not have suffered any prejudice arising from the foreperson's membership in the grand jury panel, which was admittedly chosen from a fair cross-section of the community.
"Second, the discriminatory selection of the foreperson in this case did not substantially impact the integrity of the indictment process through the involvement *242 of the foreperson. Unlike the Tennessee grand jury foreperson in Rose, the grand jury foreperson selected in this case had only a clerical involvement with the indictment process. In Rose, the Supreme Court noted that Tennessee grand jury forepersons, in addition to the ministerial functions of presiding over the grand jury, administering oaths to witnesses, and signing indictments and subpoenas, had a substantive duty to assist the district attorney in the investigation of crimes. 443 U.S. at 548, n. 2, 99 S.Ct. at 2996, n. 2. In contrast, Alabama grand jury forepersons have no duty to assist the district attorney in the investigation of crimes and are generally limited to merely reporting grand jury votes and signing the appropriate paperwork prepared by the court or the district attorney. Rule 12.5, Ala.R.Cr.P.
"Third, the discriminatory selection of the foreperson in this case did not impact the integrity of the indictment process through the foreperson's influence over the grand jury panel. Unlike the dominant and authoritative role the Tennessee grand jury foreperson played in Rose, the role of the grand jury foreperson in this case was to perform merely ministerial tasks. The Tennessee grand jury foreperson in Rose had a virtual veto power over the indictment process because under Tennessee law the failure of the foreperson to sign an indictment renders the indictment `fatally defective.' 443 U.S. at 548, n. 2, 99 S. Ct. at 2996, n. 2. In contrast, the role of a grand jury foreperson in Alabama is so ministerial that even his or her failure to participate in deliberations and to vote with the panel is not fatal to the indictment if the requisite 12 members of the panel concur in the indictment. Noah, supra. In sum, we conclude that any prejudice suffered by Pace because of the foreperson's involvement in the judicial process was not substantial and, thus, did not rise to the level of plain error.
"Although the Court of Criminal Appeals erred in holding that Pace's indictment must be quashed and that he must be reindicted, that court's holding that Pace is entitled to a new trial based on reversible error that occurred in relation to other issues this Court has not reviewed is not affected by this certiorari review. Accordingly, we reverse the judgment of the Court of Criminal Appeals to the extent that it holds that discrimination in the selection of the foreperson of Pace's otherwise properly constituted grand jury is `plain error.' We remand this cause to the Court of Criminal Appeals for an order or proceedings consistent with this opinion.
"Although we hold that no plain error occurred in this case, we are nonetheless adamant in our view that racial discrimination of any kind is utterly repugnant to the judicial process and the basic concepts of equal treatment under the law enshrined in our federal and state Constitutions. See Rose, 443 U.S. at 555-56, 99 S.Ct. at 2999-3000. If a defendant makes a timely and valid challenge to his or her indictment based on a violation of equal protection rights occurring as the result of discriminatory selection of the foreperson of the grand jury that returned the indictment, this Court will dismiss the indictment and require that if the State reindicts the accused it do so with a grand jury selected and acting free of any racial discrimination."
Pace v. State, 714 So.2d at 335-38. (Footnotes omitted; emphasis added.)
As evident from the language quoted above, the Alabama Supreme Court concluded that because of the role a grand jury foreperson plays in Alabama, any discrimination that occurs in the selection of a foreperson is not plain error, so long as the foreperson was chosen from a properly constituted grand jury. The Court, however, did not foreclose the possibility that a defendant could establish reversible error *243 by a "timely and valid challenge to his or her indictment based on a violation of equal protection rights occurring as the result of discriminatory selection of the foreperson of the grand jury that returned the indictment." Pace v. State, 714 So.2d at 338. (Emphasis added.) The Court did not specify what would constitute a valid challenge to the indictment. Perhaps, as intimated by the Court, a defendant would have to establish that "the discriminatory selection of the foreperson ... impact[ed] the integrity of the indictment process through the composition of the grand jury panel," or that "the discriminatory selection of the foreperson ... substantially impact[ed] the integrity of the indictment process through the involvement of the foreperson," or "the discriminatory selection of the foreperson ... impact[ed] the integrity of the indictment process through the foreperson's influence over the grand jury panel." Pace v. State, 714 So.2d at 337-38. Nevertheless, we do not believe that the appellant in this case has made a valid challenge to the indictment.
In this case, there was no evidence that the grand jury that indicted the appellant was improperly constituted. Moreover, the appellant did not establish that there was any discrimination in the selection of the foreperson of the grand jury that indicted him. The racial composition of the grand jury is not evident from the record. It would be sheer supposition to conclude that an African-American served on the grand jury that indicted the appellant, and that he or she was not selected to serve as foreperson solely because of racial discrimination in the selection process. Additionally, the method of selecting the grand jury foreperson disfavored in Pace was not employed in this case. The grand jury that returned the indictment against the appellant selected its own foreperson from among themselves. In a footnote in Pace v. State, the Alabama Supreme Court noted that "[t]his new procedure should limit any appearance of discrimination in the judicial process." 714 So.2d at 338, n. 6. Even if we were to assume for the sake of argument that racial discrimination played a part in the selection of the grand jury foreperson, the appellant did not establish that the discriminatory selection changed the composition of the grand jurythe foreperson was chosen from among the members of the grand juryor that the foreperson of the grand jury that indicted him exercised more than a ministerial role.
Accordingly, we hold that the trial court correctly denied the appellant's motion to dismiss the indictment on the grounds that the method of selecting grand jury forepersons in Morgan County is racially discriminatory.

III.
The appellant alleges that the trial court erred to reversal in permitting a prosecution witness, Michael Vann Riggs, to testify as to statements that the appellant made to Riggs before the commission of the crime. Specifically, the appellant asserts that the testimony was inadmissible because, he claims, the appellant's "alleged statements were too remote and too general for a jury to draw a permissible inference from them about [his] intent." (Appellant's brief, p. 11).
Riggs testified that he worked for the appellant in the summer of 1993. In the early part of July 1993, the appellant told him that "he knew where somebody could make a good lick, but you'd have to kill the son of a bitch." (R. 1881.) Riggs interpreted "lick" to mean a robbery. Riggs further testified:
"He told me that it was an old man [who ran] a salvage yard on 24, and he kept a good bit of money, but you would have to kill him because he would not give it up. I don't know if that's, you know, altogether how he said it, you know, but that's what it all boiled up to. HeI'm sure that he said you would have to kill the son of a bitch, he would not give it up and he kept a good bit of *244 cash on him. And heit was on Highway 24."
(R. 1884.)
The appellant argues that because Riggs was unsure whether he recalled the conversation exactly as it had occurred, that because Riggs could not be sure of the date of the appellant's statement, and that because the appellant did not mention the victim by name in his statement, Riggs's testimony was too remote and too general to be relevant, and, that it was therefore, inadmissible. We disagree.
In Oryang v. State, 642 So.2d 989 (Ala. Cr.App.1994), the defendant was charged with attempted murder. The trial court allowed a prosecution witness to testify that the defendant told him that "one day he was going to kill someone `for the hell of it.'" 642 So.2d at 996. The defendant made this statement to the witness sometime in 1990, and the shootings did not occur until December 1991.
This Court found that the trial court properly admitted the statement. We held:
"[T]he testimony concerning the appellant's statement that one day he was going to kill someone `for the hell of it,' was relevant and not too remote. The appellant argues that he lacked the requisite intent to commit this offense ...; thus this prior statement was clearly relevant to prove that the appellant intended to murder individuals `for the hell of it' or randomly, such as by shooting into passing vehicles. But see Roberson v. State, 339 So.2d 100, 102-03 (Ala.Cr.App.), cert. denied, 339 So.2d 104 (Ala.1976) (wherein the defendant's prior statement that he wanted a third party to go with him on a robbery of a McDonald's restaurant was held not to be relevant in a case involving the robbery of a McDonald's restaurant two months following the appellant's statement, because the plans for the actual robbery were made subsequent to the statement, and the prior statement `did not refer to any particular McDonald's but only to "a McDonald's."' Id. at 103.)
"Moreover, `[t]he rule is stated to be that the acts, declarations and demeanor of an accused before or after the offense whether a part of the res gestae or not are admissible against him, but unless a part of the res gestae are not admissible for him.' Smoot v. State, 381 So.2d 668, 671 (Ala.Cr.App.1980), and cases cited therein.
"The trial court did not abuse its discretion in allowing this prior statement made by the appellant into evidence against the argument that it was too remote. In White v. State, 380 So.2d 348 (Ala.Cr.App.1980), this court held that evidence that a defendant, who was charged with the murder by shotgun of his wife, had cut his wife prior to the offense was admissible and not too remote, although the only evidence presented as to the date of the prior cutting was that it occurred `"a long time ago."' In holding that the trial court did not abuse its discretion in allowing this evidence, this court stated:
"`"Ordinarily, remoteness of time affects the weight and probative value of evidence rather than its admissibility. It rests largely in the enlightened discretion of the court whether or not such proof will be allowed. Remoteness has regard also to factors and considerations other than mere lapse of time. It results, therefore, that it is practically impossible and not at all accurate to attempt to state a fixed rule or standard with particular reference to the time element. Of course it can be said with certainty that the tendered evidence must not be so remote in point of time as to be without causal connection or logical relation to the main event. Notwithstanding evidence may be logically relevant, its admissibility does not follow unless it has some probative value to the inquiry of instant concern."

*245 "`Smitherman v. State, 33 Ala.App. 316, 318-319, 33 So.2d 396 (1948).
"`Remoteness with respect to the admissibility of evidence is a relative idea and varies in its application according to the facts of each case. Dorch v. State, 40 Ala.App. 475, 476, 115 So.2d 287 (1959).
"`While remoteness of time alone does not render the prior event inadmissible, Fields v. State, 362 So.2d 1319, 1320 (Ala.Cr.App.1978), the trial court "is without discretion to admit a statement that is so remote as to time or circumstances that its relevance or materiality must rest in conjecture and speculation." Roberson v. State, 339 So.2d 100, 104 (Ala.Cr.App.), cert. denied, 339 So.2d 104 (Ala.1976).
"`"Whether evidence offered is too remote to be admissible is for the court, in the exercise of a sound discretion, and such ruling will not be revised on appeal unless it is plain that error was committed. However, where the competency of evidence is doubtful, the better practice is to allow the evidence to go to the jury, leaving them to determine its weight and credibility. That is to say, if the evidence tends to prove a fact for determination by the jury, however slight the evidence may be, it is relevant."
"`Sorrell v. Scheuer, 209 Ala. 268, 269, 96 So. 216, 217 (1923). (Citations omitted.)
"`See also Pitts v. State, 261 Ala. 314, 316, 74 So.2d 232 (1954).'
"White v. State, 380 So.2d at 350. See also Lundy v. State, 539 So.2d 324, 331 (Ala.Cr.App.1988) (wherein this court held that the trial court did not abuse its discretion in holding admissible the substance of conversations by the defendant that allegedly had occurred approximately one and one-half to two years prior to the offense at hand)."
Oryang, 642 So.2d at 997-98 (Emphasis added in Oryang).
This situation is distinguishable from the case of Roberson v. State, 339 So.2d 100 (Ala.Cr.App.1976), cited by the appellant, and noted in Oryang, supra. In that case, the defendant's statement to a third party that he wanted that person to go with him to rob a McDonald's restaurant was too remote because the statement occurred some months prior to the actual robbery of the McDonald's and because it was merely a general solicitation to rob a McDonald's, not the particular McDonald's that was actually robbed. In this case, the appellant's statement was close in time to the crime and it contained specific details that were consistent with the description of the victim. It was not merely a generalized statement that the appellant wanted to rob someone.
Accordingly, the trial court did not abuse its discretion in allowing Riggs to testify regarding statements the appellant had made to him prior to the crime.
Riggs's testimony concerning what the appellant told him was also correctly admitted because the appellant's statement constituted a threat against the victim.
"In a charge of homicide or assault, a threat by the accused to kill or injure the victim is admissible as tending to show a design in the accused to commit the crime, and hence, as tending to show the accused's commission of the crime. Some courts have held such threats admissible as tending to show malice or intent on the part of the accused. While remoteness is always a basis for excluding evidence in extraordinary circumstances as determined within the discretion of the trial court, the decisions reflect that such a threat is admitted no matter how much time has elapsed between it and the homicide or assault.
". . . .
"A threat not directed toward the victim is not admissible in a present criminal prosecution. A vague threat against no person in particular, for example, is *246 not admissible against the accused unless accompanied by evidence warranting an inference that the threat was directed against the victim. Although the victim is not named in the threat, if the evidence of other circumstances warrants an inference that it was directed against the victim or a class of which the victim was a member, then the threat is admissible."
C. Gamble, McElroy's Alabama Evidence, § 44.02(1) (5th ed.1996.) (Footnotes omitted.) See also Wilson v. State, 690 So.2d 449 (Ala.Cr.App.1995), aff'd in part, quashed in part, 690 So.2d 477 (Ala.1997); Childers v. State, 607 So.2d 350 (Ala.Cr. App.1992), opinion after remand, 640 So.2d 15 (Ala.Cr.App.), rev'd on unrelated ground, 640 So.2d 16 (Ala.1994); Cowart v. State, 579 So.2d 1 (Ala.Cr.App.1990). Here, sufficient evidence was presented from which one could reasonably infer that the appellant's threat was directed toward the victim.
The appellant suggests in a footnote to his discussion of this issue that the trial court erred in allowing prosecution witnesses Beverly Robinson and Rex Segars to testify as to statements the appellant made to them before the crime. We disagree.
Beverly Robinson, the appellant's half-sister, testified that the appellant had made two statements to her regarding the crime. She testified that the first statement was made six to eight weeks before the crime. On that occasion, she and Rex Segars, her common-law husband, were talking with the appellant about money. During their conversation, the appellant told them that "he knew where he could get some quick cash if we were interested in it." (R.2027.) Robinson further testified that the appellant said that he knew a man who would be an easy target for a robbery, that the man's name was Dalton Pace, and that he lived alone.
Robinson testified that the second incident occurred a couple of weeks later in the parking lot of a grocery store. During that conversation, the appellant again brought up the subject of the robbery. Robinson testified that the appellant said, "I'm serious about that old man out there. It would be pretty easy." (R.2029.) She testified that the appellant again mentioned Pace's name. He told them that Pace lived by himself and that he ran a junkyard. Robinson said that when Segars asked the appellant how he knew Pace, the appellant responded that he had been to his business and that he had bought some parts from him. The appellant told Robinson and Segars that Pace carried a "wad of money on him." (R.2029.)
Rex Segars testified that about a month before the crime, he had had a conversation with the appellant during which the appellant mentioned the crime. Segars testified:
"He just said he knew a man who owned a junkyard by the name of Pace in Decatur who carried a large sum of money. And I said, `Well, what are you going to do?' He said, `There ain't but one way to do it.' He said, `I'm going to have to kill him because he's a big old tough S.O.B."
(R. 2218.)
For the reasons set forth above, Beverly Robinson and Rex Segars were correctly permitted to testify as to their conversations with the appellant. We note that the trial court did prohibit Segars from testifying regarding his recollection of the conversation that occurred at the grocery store because the court found that Segars's recollection of the conversation lacked sufficient detail. (R. 2215-16.)

IV.
The appellant claims that the trial court violated his right to cross-examination "by prohibiting him from impeaching a key witness with prior convictions." (Appellant's brief, page 17.) Specifically, he alleges that the trial court erroneously refused to allow him to question Michael *247 Van Riggs as to whether Riggs had previously been convicted of third-degree assault and second-degree criminal mischief. In support of his assertion, he argues that "because Mr. Riggs was a criminal who was testifying as part of a plea bargain, it was especially important for defense counsel to impeach him with his prior convictions." (Appellant's brief, p. 18.)
During its direct examination of Michael Van Riggs, the prosecution elicited that Riggs had two criminal charges pending against him, and that he had agreed to testify truthfully in this case pursuant to a plea bargain agreement with the state. The prosecution also elicited that Riggs had several other prior convictions.
During the appellant's cross-examination of Riggs, the appellant sought to question Riggs about whether he had ever been convicted of third-degree assault and criminal mischief in the second degree. The prosecution objected on the ground that those offenses did not constitute crimes of moral turpitude. The trial court sustained the prosecution's objections.
Section 12-21-162(b), Code of Alabama 1975, provides: "[a]s affecting his credibility, a witness may be examined touching his conviction for a crime involving moral turpitude, and his answers may be contradicted by other evidence."[4] The trial court did not err in refusing to allow the appellant to ask Riggs whether he had a prior conviction for third-degree assault, because third-degree assault has been held not to be a crime of moral turpitude. See Finley v. State, 661 So.2d 762 (Ala.Cr.App. 1995); Few v. State, 518 So.2d 835 (Ala.Cr. App.1987). Compare Johnson v. State, 629 So.2d 708 (Ala.Cr.App.), aff'd, 629 So.2d 714 (Ala.1993) (the felony offense of assault in the second degree is a crime of moral turpitude.)
Our research has revealed no Alabama cases addressing whether criminal mischief in the second degree constitutes a crime of moral turpitude; however, we need not address this issue because we are convinced that any error in the trial court's refusal to permit the appellant to question Riggs about whether he had a prior conviction for second-degree criminal mischief was harmless. Rule 45, Ala.R.App.P. Riggs was thoroughly cross-examined by the appellant. Both the prosecution and the appellant elicited that Riggs had several other prior convictions. In addition, the appellant was allowed to explore the details of Riggs's plea bargain agreement with the state. Thus, Riggs's credibility was certainly called into question. Accordingly, we find that the impeachment value of the prior convictions for assault in the third degree and criminal mischief in the second degree was negligible at best, and that any error in the trial court's refusal to allow the questioning was harmless. Tucker v. State, 650 So.2d 534 (Ala. Cr.App.1994).

V.
The appellant contends that "the trial court erroneously admitted highly prejudicial hearsay evidence against" him. (Appellant's brief, p. 21.) Specifically, he alleges that the trial court improperly allowed prosecution witness Michael Eaton to testify that shortly before the victim's death, the victim asked Eaton whether he knew the Drinkards.
During the prosecution's examination of Eaton, the following occurred:
"Q: How often would you say you saw Mr. Pace before his death?
"A: Usually two or three times a week. I would stop by at least twice every week.
"Q: Stop a couple of times a week?
"A: Yes, sir.

*248 "Q: Did Mr. Pace have anysay anything unusual to you or anything odd the last couple of weeks before his death?
"MR. DIGIULIAN [defense counsel]: Judge, we're going to object to what Mr. Pace might have said.
". . . .
"MR. DIGIULIAN: I don't see how it's relevant and material, and besides that, it's hearsay and it's objectionable.
"MR. MATTHEWS [prosecutor]: Your Honor, it's not hearsay if it's not for the truth of the matter as he heard it and it's not hearsay if it's a question, and I expect him to testify about a question that Mr. Pace asked him.
"MR. DIGIULIAN: Judge, I don't see how it couldn't be hearsay even if it is a question.
". . . .
"MR. MATTHEWS: The law of the State of Alabama says it's not up to inquiry, your Honor.
"THE COURT: Well, that's my understanding. Youyou're proffering that he's going to testify to a question?
"MR. MATTHEWS: Yes, sir. A question that was asked of him by Mr. Pace.
"THE COURT: I'll overrule your objection.
". . . .
"Q: (BY MR. MATTHEWS) Did he ask you a question?
". . . .
"A: Okay. The question he asked me, if I knew any Drinkards that live around Hartselle. No, excuse me, Falkville.
"Q: He asked if you knew any Drinkards that lived around Falkville?
"A: Yes, sir."
(R. 1556-60.)
We find no error in the trial court's ruling. "`Hearsay testimony consists of an out-of-court statement offered to prove the truth of the matter asserted.'" Adams v. State, 659 So.2d 224, 226 (Ala.Cr.App.1994), quoting Brannon v. State, 549 So.2d 532, 539 (Ala.Cr.App. 1989). (Emphasis added.) In this case, the question asked by the victim "was not, on its face, an `assertion.' It was not a statement of fact; it was an inquiry." Inmin v. State, 654 So.2d 86, 90 (Ala.Crim. App.1994). Accordingly, this particular utterance did not constitute hearsay. Inmin, supra.
The appellant also suggests that because the witness did not tell the district attorney about the question the victim asked him until a week before the trial, his testimony was suspect. In support of this assertion, he claims "Mr. Eaton could not possibly have miraculously, and truthfully, remembered the victim asking him that unremarkable question over two years before the trial." (Appellant's brief, p. 22) The credibility of the witness's testimony is a question for the jury to decide. Petway v. State, 690 So.2d 531 (Ala.Cr.App. 1996). Furthermore, on cross-examination, the appellant challenged the witness's credibility on the basis that he had not told the district attorney or the police about the question earlier.

VI.
The appellant maintains that the trial court erred in failing to grant his challenge for cause of a prospective juror. Specifically, he contends that the trial court erroneously failed to strike prospective juror D.L., and that this error forced him to use one of his peremptory strikes to remove D.L. from the jury.
During voir dire examination the following occurred:
"Q [defense counsel]: ... Mr. L., you said that you knew or lived in the community with Mr. Pace's brothers, is that correct?
"PROSPECTIVE JUROR L.: Yes, sir.
"MR. DIGIULIAN [defense counsel]: Are they personal friends of yours?

*249 "PROSPECTIVE JUROR L.: Mr. J.C. is.
"MR. DIGIULIAN: All right. And is he his older or younger brother?
"PROSPECTIVE JUROR L.: I don't know.
"MR. DIGIULIAN: Okay. Do you visit with Mr. J.C. Pace? How do you know him?
"PROSPECTIVE JUROR L.: He has helped me out several times. I've got a farm, and he's helped me out several times cutting my hay and when I get in a bind, he helped me cut hay or make hay, and he's got cows and I've got cows and I've seen him at the sale barn several times.
"MR. DIGIULIAN: The other brother, do you know him?
"PROSPECTIVE JUROR L.: I've met him a few times. My daddy worked with him at Willo Products for several years and I have met him, you know, talked to him. Not real, real close.
"MR. DIGIULIAN: Would that association with either of those two brothers, would that in any way affect or influence your ability to judge and weigh the evidence as you hear it from the witness stand?
"PROSPECTIVE JUROR L.: I don't think so, but I think they're all good people, you know.
"MR. DIGIULIAN: I understand. Now how would you feel about, let's suppose and we'll get into this later on about the burden of proof and reasonable doubt and so forth, but let's suppose that the State doesn't prove its case and you're selected to be on this jury and you go back in the jury room and y'all consider the evidence and you decide, `Well, the State just hasn't proved its case, and therefore I have to vote not guilty.' Would you be able to do that and face Mr. Pace's brothers?
"PROSPECTIVE JUROR L.: I would think so, but I don't know for sure.
"MR. DIGIULIAN: It would be pretty difficult, wouldn't it?
"PROSPECTIVE JUROR L.: It would be difficult.
"MR. DIGIULIAN: And is it a position in which you'd rather not find yourself?
"PROSPECTIVE JUROR L.: Not really."
(R. 1264-67.)
At the conclusion of the voir dire of the panel of prospective jurors, the parties presented their challenges for cause, during which the following exchange took place:
"MR. DIGIULIAN: D.L. He said that he knew at least one or two of Mr. Pace's brothers, that one of Mr. Pace's brothers helped him on his farm, that he would be uncomfortable having to return a not guilty verdict in this case, and then seeing Mr. Pace's brothers, and he would just rather not do that.
"THE COURT: All right. I'm going to deny your challenge with respect to D.L. Any others?
"MR. DIGIULIAN: No, sir.
". . . .
"MR. DIGIULIAN:.... Judge, if I might read this as to Mr. L. for a minuteMr. Mason [co-defense counsel] tells me that his notes and his recollection was that Mr. L. said that it would be difficult for him to decide the case fairly.
"THE COURT: I don't have anyI don't have any notes about it there. I have notesI made notes that he knew, of course, the alleged victim's family and it would be hard to face them in the event of a not guilty verdict. But I don't have anything to thatanything said he'd have difficulty being fair in this case. When did that come out?
"MR. MASON: Well, I think his exact language, your Honor, was he would have difficulty remaining unbiased in *250 this case, or words to that effect. I don't recall exactly his precise language.
"THE COURT: Do y'all have any position on that?
"MR. MATTHEWS [prosecutor]: Your Honor, I remember Mr. L. saying something along the lines of being uncomfortable, but I didn't think heanything I heard about bias or prejudice. I think that if you know a little something or somebody involved you may be uncomfortable, but
"THE COURT: I just don't have and I tried to watch him very carefully because he indicated that he was familiar with the Pace family. And I just simply don't have a recollection or a note that he demonstrated that he would have any bias or that he would be unable to render a fair and impartial verdict. I'm going to continueI`m going to deny your challenge with respect to Mr. L."
(R. 1321-23.) (Emphasis added.)
The appellant argues that D.L. was prejudiced against the defense because of his relationship to the victim's family; therefore, he claims, the trial court erred in denying his challenge for cause of this prosecutive juror. We disagree.
"A trial court's ruling on challenges for cause based on alleged bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). To justify a challenge for cause there must be a statutory bias or some matter that imports absolute bias or favor and leaves nothing to the discretion of the trial court. Pardue v. State, 571 So.2d 320 (Ala.Cr.App.1989), rev'd on other grounds, 571 So.2d 333 (Ala.1990); Minshew v. State, 542 So.2d 307 (Ala.Cr. App.1988). Even proof that the veniremember is biased or has a fixed opinion is insufficient. There must be proof that the opinion was so fixed that it would bias the verdict of the veniremember. Clark v. State, 443 So.2d 1287 (Ala.Cr. App.1983). If the veniremember indicates that he or she can lay aside that impression or opinion and render a verdict based on the evidence presented in court, the juror is not subject to challenge for cause. Minshew v. State; Mahan v. State, 508 So.2d 1180 (Ala.Cr. App.1986)."
Smith v. State, 698 So.2d 189, 200 (Ala.Cr. App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).
In this case, there was no statutory basis for a challenge for cause of prospective juror D.L. Although D.L. did indicate that he knew a couple of members of the victim's family, this fact, alone, does not justify a challenge for cause. McKinney v. State, 654 So.2d 95 (Ala.Cr.App. 1995). There was simply no evidence that D.L. had an opinion about the case that was so fixed that it would bias his verdict. Smith, supra. In fact, in response to a question propounded by defense counsel, D.L. indicated that if he found the state's evidence to be insufficient, he could stand by his belief that the appellant was not guiltyeven if he were the only juror to hold that belief. (R. 1312-13; 1315.) Furthermore, the trial court, in denying the challenge for cause, stressed that it had paid careful attention to D.L.'s demeanor and that it did not see any evidence that D.L. was biased to the point that it would affect his verdict. "The trial judge was in the best position to evaluate the demeanor of the prospective juror and to `hear not only the words recorded by the court reporter but also the meaning actually conveyed by the responding prospective juror.'" Stewart v. State, 730 So.2d 1203, 1225 (Ala.Cr.App.1997), quoting, Clark v. State, 443 So.2d 1287, 1289 (Ala.Cr.App. 1983). Accordingly, the trial court did not abuse its discretion in denying the challenge for cause of prospective juror D.L.

VII.
The appellant maintains that his conviction must be reversed because, he says, *251 there were "many critical discovery violations." (Appellant's brief, p. 28.) He addresses what he alleges were six violations, each of which we will address separately.

A.
The appellant contends that "[t]he prosecutors repeatedly failed to provide timely discovery of critical evidence to the defense." In support of his assertion, he alleges:
"Prior to trial the court ordered the state to `provide the defendant with a NCIC history or summary of arrest and dispositions with regard to each non-law enforcement witness who will testify for the prosecution.' (C. 49.) The prosecutors violated the court's order by not disclosing the complete arrest record of one of their key witnesses, Ms. Beverly Robinson."
(Appellant's brief, pp. 28-29.) Specifically, the appellant claims that the prosecution failed to disclose that Beverly Robinson had three "convictions" for issuing worthless checks.
The record reflects that some time after Beverly Robinson had testified, the following occurred:
"MR. KING [defense counsel]: Judge, we just found out Ms. Beverly Robinson, under the name Beverly Lambert, received three judgments of convictions against her regarding issuing worthless checks. And we would expect the files to indicate sometime in June of 1993, the arrest warrants were signed and that she was brought in and pleaded guilty to these crimes. And the NCIC report that we were provided didn't list these and we didn't find out about this until this morning. And I went up to the worthless check unit to review the files and they wouldn't let me see them. We do have a certified judgment of conviction that I got this morning from the district court clerk, and had I known of these, I would have obviously questioned Ms. Robinson about these and about when she was first notified that the police were looking for her and that type of thing. And I would make a motion that the Court allow us to go into this judgment of conviction, talk about it, talk about the district court files and the date that the arrest warrants were issued. Alternatively, we would request, although we don't know if we're going to call her yet because we just found out about this, we would request that we be able to question Ms. Robinson about these. Because you issued an order that they were supposed to provide us with all criminal history.
"THE COURT: Well, of course, we agreed that the NCIC reports, I think, is what would be furnished and I don't understand, you know, why they weren't disclosed. Mr. Matthews, any idea?
"MR. MATTHEWS [prosecutor]: Other than I understood that the cases were dismissed rather than a conviction, and there is a statement at the bottom a `dismissal option if paid timely.' I know the way the district court functions on most of these cases, if they are paid within a certain amount of time, even if someone pleads guilty, the cases are ultimately dismissed and then do not appear as a conviction. And you can't tell from this whether or not that was done since this is just one page.
"MR. KING: Judge, I'll enter, if I can call it Defendant's Exhibit A, to my motion.
"THE COURT: All right, let me see it.
"MR. KING: And we've got the district court files if you want those.
"THE COURT: I don't know what that means at the bottom, `dismissal option if paid timely.'
"MR. KING: I think it goes to show that it was part of the deal for her coming to testify, Judge. And that's something we're at least entitled to have the jury hear, because she didn't mention that when she took the stand. And the State did not provide us any evidence *252 that those arrest warrants were out there and they were issued some time, the court file will indicate I think, June or July of 1993.
"MR. MATTHEWS: That was before this happened.
"MR. KING: Well, that's our point.
"MR. MATTHEWS: Your Honor, as I see
"MR. KING: Judge, she would have received some notice from the court system about these checks, and I think that also goes to her prejudice and her motive. And we haven't had a chance to find out what kind of notice she did have of these charges. She could have talked to the police about these, I don't know. But I don't think it's our duty to have to find things like that."
(R. 2301-05.)
The discussion regarding whether Ms. Robinson had been convicted for issuing worthless checks continued. The following then occurred:
"THE COURT: Well, here's my view of it. Number one, this appears to be a judgment of conviction, but I don't know for sure. And what I'm going to have you do is go to Judge Breland, since he wrote the orders, and get an interpretation, and if it's a judgment of conviction, then I will allow you to recall Ms. Lambert or Ms. Robinson, whichever it is, and I'll allow you to cross-examine her on the matter of these convictions. We won't go into all the circumstances, but, you know, you'll be allowed to ask her if she was arrested, when she was arrested, and was she convicted and when was she convicted.

"MR. KING: Well, Judge, even if he says, which I don't know what he's going to sayeven if he says these were dismissed, I would move for leave of Court to have time to go get certified copies of these arrest warrants, which were issued prior to the murder, because that could go to her state of mind as to why she made the statement she made. It could go to the fact that the State could still be cutting a deal with her, and the jury is entitled to hear what that deal is. And if this is part of the deal, they haven't heard it.
"THE COURT: Well, the arrest warrants are in the file.
". . . .
"MR. KING: But, they're not certified.
". . . .
"THE COURT: We can make copies, you know. If you've got the files here, we can make both copies out of them. You don't have to get them certified.
"MR. KING: Okay. Thank you, Judge.
"THE COURT: But I don't know what that means down at the bottom, and I think that's Judge Breland's handwriting, and I know that there is a practice whereby if restitution and service charges are paid, then there is some kind of a dismissal or some other disposition, and I don't know whether that amounts, under the system the way they work, as a conviction or not a conviction. And that's what we need to find out from him.
"MR. KING: Do you want him to come up here?
"THE COURT: I'm going to let you talk to him, and you know, if you're not satisfied with what he tells you, then I guess we'll have him come up here so he can explain to me how they did it at that time.

"MR. KING: Yes, sir. Thank you."
(R. 2306-09.) (Emphasis added.) The record contains no further discussion about this matter, and the defense did not recall Beverly Robinson to testify.
As evidenced from the above excerpt, there was some confusion as to whether Beverly Robinson actually had three prior convictions for issuing worthless checks. Assuming for the sake of argument that she did and that the prosecution was required to disclose this information *253 to the defense, no reversal is warranted.
"We have ... made it clear ... that not every violation of Rule 16 requires the suppression of the undisclosed evidence. E.g., Buchannon [v. State], 554 So.2d [477] at 486 [(Ala.Cr.App.1989)]; Fortenberry v. State, 545 So.2d 129, 142 (Ala. Cr.App.1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); McCrory v. State, 505 So.2d 1272, 1279 (Ala.Cr.App.1986). Instead, Rule 16.5 `gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court's discovery order.' Clifton v. State, 545 So.2d 173, 178 (Ala.Cr.App. 1988).
"Rule 16.5 provides in pertinent part:
"`If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such order as the court deems just under the circumstances.'
"Whether and to what extent a trial court imposes sanctions for non-compliance with Rule 16 rest `within the sound discretion of the court.' McCrory v. State, 505 So.2d at 1279."
Pettway v. State, 607 So.2d 325, 330-31 (Ala.Cr.App.1992).
When the alleged discovery violation came to light, the trial court gave the defense the opportunity to inquire as to whether Beverly Robinson had been convicted of issuing worthless checks, and it also gave the defense the opportunity to recall Ms. Robinson for further questioning in the event that she had been. Under the circumstances, the trial court's remedy was sufficient to address any prejudice caused by the failure of the prosecution to disclose the information regarding Beverly Robinson. Accordingly, no reversal is warranted. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), opinion on remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
The appellant argues that "the state's untimely disclosure of evidence with respect to Ms. Robinson was part of a larger pattern of state discovery violations." (Appellant's brief, p. 30.) He cites three examples in support of this assertion. First, the appellant claims that the prosecution did not "properly disclose that Mr. Eaton, a state witness, made a statement to the police prior to trial." (Appellant's brief, p. 30.)
On direct examination, Eaton testified that approximately three months before the victim's death, the victim asked him whether he knew any Drinkards who lived around Falkville. On cross-examination, Eaton testified that he did not tell the district attorney about the victim's question until a week before trial, nor did he mention the victim's question in his written statement to the police. The defense moved to strike Eaton's testimony regarding the victim's question on the basis that the prosecution had not furnished this information to the appellant. The trial court denied the motion.
The appellant contends that "[t]he state should have disclosed to the defense before trial this highly prejudicial statement," and that "the trial court should have granted defense counsel's motion to strike his testimony." We disagree. First, neither Rule 16, Ala.R.Crim.P., nor the trial court's discovery order requires the prosecution to disclose nonexculpatory statements made by a prosecution witness. See, Gowens v. State, 639 So.2d 524 (Ala.Cr.App.1993), cert. denied, 513 U.S. 893, 115 S.Ct. 242, 130 L.Ed.2d 165 (1994); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. *254 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Furthermore, even if the prosecution should have disclosed the statement Eaton made a week before trial, no reversal is warranted because the appellant failed to establish how he was prejudiced by the prosecution's failure to do so. As discussed in Part V of this opinion, the appellant did test Eaton's credibility by eliciting during his that testimony he did not reveal the victim's question at an earlier date.
Next, the appellant alleges that the prosecution "did not disclose until the weekend before the trial the name of Mr. Perry Davis, a state witness." (Appellant's brief, p. 31.) Davis testified, in essence, that he had purchased a truck motor from the victim for $550 late in the afternoon on the day the victim was killed.
At the beginning of the prosecution's examination of Perry Davis, the following occurred:
"MR. DIGIULIAN [defense counsel]: Judge, we're going to object to this witness testifying. We've not been provided with other than a name and it was provided, as I recall, the weekend before trial. I've not had an opportunity to talk to this witness. This witness has been, at least, known to the family since August 18, 1993, and was available apparently to the State since that time, and we haveall we got was notice of a name and that was it, back inmaybe the week before the trial started. We've been provided no statement, no nothing. I take that back, we've been provided with one item with regard to this person. We were supposed have been provided with no statement [sic], and the man's been known to the State for two years and we object to him testifying."
(R. 1818-19.) The trial court overruled the appellant's objection. The prosecutor elicited that the witness had not given a written statement to the police, and that he had not talked to the prosecutor prior to the day of his testimony.
Although the appellant initially appears to be arguing on appeal that he was ambushed by a surprise witness, a closer examination of his argument reveals that he is actually asserting that the witness should not have been allowed to testify because the defense was not provided a copy of the witness's statement. This assertion must fail for the reasons set forth above. See also, Wedgeworth v. State, 610 So.2d 1244 (Ala.Cr.App.1992).
Last, in one sentence, the appellant alleges that the "state failed to give timely notice of the aggravating circumstances on which it intended to rely." (Appellant's brief, p. 31.) There is no merit to this assertion. "A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances." Bush v. State, 695 So.2d at 87. Furthermore, pursuant to the trial court's order, the prosecution did provide notice of the aggravating circumstances that it intended to rely upon. (R. 398-408; 460-63; C.R. 344, 353-55; 398.)

B.
The appellant alleges that the trial court erred in refusing to order the prosecution to disclose the criminal records, if any, of law enforcement personnel who were witnesses at trial. We disagree.
"There is no absolute right to discovery, including discovery of prior convictions of witnesses or of possible impeachment evidence, in criminal cases. Smith v. State, 639 So.2d 543 (Ala.Cr. App.1993); Bailey v. State, 421 So.2d 1364 (Ala.Cr.App.1982). Rather, the trial court has discretion in determining whether to order discovery of the prior convictions of witnesses or other possible impeachment evidence, and such a decision will not be overturned absent an abuse of discretion. Ross v. State, 555 So.2d 1179 (Ala.Cr.App.1989); Williams v. State, 451 So.2d 411 (Ala.Cr. App.1984); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1982); Mardis v. State, 423 So.2d 331 (Ala.Cr.App.1982)."
*255 Davis v. State, 720 So.2d 1006, 1027 (Ala. Cr.App.1998).
The trial court declined to order the state to produce criminal records of the law enforcement personnel who were witnesses, on the basis that it was highly unlikely that any of the law enforcement personnel had prior convictions; however, the trial court's ruling was not absolute. The trial court indicated that it would reconsider its ruling if the defense showed that it was likely that a law enforcement witness had a criminal record. (R. 27-28.) The defense did not make such a showing. We find no abuse of discretion in the trial court's ruling.

C.
The appellant claims that the trial court erred in denying his motion in limine to preclude the state from introducing any evidence obtained from the victim's house and to preclude the state from eliciting testimony about any of the evidence gathered from the victim's house. We disagree.
The record reflects that on September 9, 1993, the appellant filed a motion in district court requesting a preliminary hearing. On that same day, the appellant filed a motion in district court seeking permission to examine the crime scene. The district court denied the latter motion, stating that it lacked subject matter jurisdiction. (C.R.20.) A preliminary hearing was conducted and the district court found probable cause to believe that the crime charged was committed by the appellant. The appellant was bound over to the grand jury. In November 1993, the victim's residence was destroyed by fire before the appellant had a chance to examine the crime scene.
In February 1994, the appellant filed a motion in limine in the circuit court seeking to preclude the introduction of any evidence found at the victim's residence and to preclude any state witness from testifying about the evidence obtained from the victim's residence. In support of this motion, the appellant argued, "[s]ince the defendant is unable to test, view, and identify items located at the crime scene, it would be prejudicial error for the Court to allow the State's witnesses to discuss any evidence relating to the crime scene." (C.R.154.)
In a motion hearing conducted prior to trial, the following occurred:
"MR. KING [defense counsel]: Judge, we had filed a motion in limine to exclude any testimony about Mr. Pace's residence or any items obtained from that residence. It is one of those that was filed a long time ago, so rather than you having to go try to find it, if you will allow me to basically tell you what
"THE COURT: I have got it right in front of me.
"MR. KING: Okay, Judge. That house burned before we could get a court order from the Court allowing us to review the crime scene. I had filed a motion in district court to allow us to review the crime scene, but that was denied by Judge Bibb based upon the grounds that he didn't feel he had jurisdiction to order that or to allow that to be done. There is a case called Gurley v. State, 639 So.2d 557 [(Ala.Cr.App. 1993)], a 1993 case, and in that case, Judge, the Court allowed an investigator's testimony that he found charred remnants of a billfold in the backyard of a house owned by the defendant's girlfriend's mother. And it was basically they were trying to show he stole somebody's wallet and then burned it. They were trying to say this charred piece of evidence here is the defendant's wallet, and the State either lost or destroyed the evidence. Nobody knows what happened to it, to that charred material. Here's the case, if I may approach the bench. And so the investigator was just allowed to talk about the fact that he had found a charred object that appeared to be a wallet, and the trial court let that testimony in and it went up on *256 appeal and the appellate court said, `Well, since the defendant was not able to test the wallet, look at the wallet, etc., then that testimony regarding the charred object was not admissible.' We would make the same argument as to the house. I have got a police report that Mr. Ted Holland, who is the chief officer, is on call to come, and I tried to call and get him. I have been trying to find him. But I do have a fire department report that states that the house burned November 8, 1993, which was prior to the Court's ruling on our motion to inspect the premises. Of course, I realizeI don't think you were even a judge then, butand the house burned of `suspicious origins,' and basically, if you go out there and look at the premises, Judge, it's just an empty field with grass. There's absolutelyI'll show the Court a picture, and that is the picture of the area where the house used to sit."
". . . .
"THE COURT: Mr. Matthews, any response on this motion?
"MR. MATTHEWS [prosecutor]: Your Honor, trying to maintain an analogy by keeping a wallet whether or not the State lost it and what the State has to do about this, the wallet was in the State's possession and they lost it in that case. The case, of course, from this county didn't maintain the custody of it and therefore the Court on appeal thought it was appropriate to suppress it. The testimony did not come in about that. But I guess what Mr. King is arguing is when we have a case that occurs in a house, the house should be sealed off and maintained as evidence until we come to trial. That's the only thing I see that is an analogy in there. In this particular case, I don't know how many, 50, 100 photographs [were taken] in the house, somewhere in that neighborhood, photographs were taken at the time. There have been copies supplied to the defense. The videotape in this case has been made available to them of the house out there if they want to see that. Everything we can give them about the time when they are asking for, basically, is if a crime occurs in the house, that the house should be sealed and maintained until they have had a chance to examine it. Well, your Honor, that's just not practical. They have not submitted any way they can be prejudiced in their case or what they might have found or could have found and what in particular they could be looking for, and I don't see that there's any analogy at all, your Honor. And further, it's not been shown in any way that the destruction of this house was in any way done by the State or the prosecution, and I think to make an analogy to this case, that's what they are having to argue, is the suspicious origin and the fire is somehow done by the State, that we destroyed the evidence in some fashion so it wouldn't be available for trial.
"MR. KING: Judge, if I may, I'm not saying that they destroyed the house, and I'm not saying that they have a duty to maintain the house as a crime scene, just as I don't even think they would have to go to a Circle K [convenience store] and lock it up until trial. But the point of my argument is the evidence is not here for us to examine. That's our argument. We don't care for what reason it's not here, but we feel the attorneys filed the motion to inspect the premises a long time ago, like I filed one in district court. We've done everything we could to see the house and haven't been able to. I would also like to point out to the Court that, you know, we are not able to measure the house, do our own independent testing of anything that was inside the house as we see it, and it's hard to even get an idea of what a premises looks like when you have just seen snapshots of it. Just photographs, and I realize this may come up on a motion to suppress, also.
"THE COURT: Well, the way I read the Gurley case, is that the State was trying towell, two problems. Number *257 one, they had an item that was unrecognizable because it was so charred. In other words, you couldn't tell from the photograph what it was, and the judge ordered the photographs excluded basically on the ground that you couldn't tell what it was in the photographs. And then having done that, still allowed the witness to testify about what the item was, and I think that under the circumstances of that, y'all, we are talking about something different, and I am not saying it won't come up during the course of the trial. The State may try to offer something that's unrecognizable and we don't know what it is and everybody is speculating about it and they have had testing done and you haven't had an opportunity to test it. If that comes up, we may have a problem. But again, I just don'tjust as a general proposition, I'm not going to grant your motion to exclude anything and everything that was recovered from the scene. And we may have to take it item by item, depending on what condition it's in.
"MR. KING: Thank you, Judge...."
(R. 494-501.)
While the district court did have jurisdiction to conduct the appellant's preliminary hearing, see §§ 12-12-32 and 15-11-2, Code of Alabama 1975, it did not have jurisdiction to rule on the appellant's motion to view the crime scenethe circuit court has exclusive jurisdiction of all felony prosecutions punishable by a sentence of death, see § 12-11-30, Code of Alabama 1975, and Rule 2.2(a), Ala.R.Crim.P. Accordingly, the District Court did not err in denying the appellant's motion to view the crime scene.
We find no error in the circuit court's denial of the appellant's broad motion in limine. As the trial court noted, this case is distinguishable from Gurley v. State, 639 So.2d 557 (Ala.Cr.App.1993). In this case, the state did not introduce or allude to charred evidence that was unavailable to the defense for examination or testing. Although the appellant did not get to actually examine the victim's residence, he did have the opportunity to examine the numerous photographs and the videotape taken of the victim's residence, and he also had the opportunity to examine and test the evidence gathered at the residence.

D.
Prior to trial, the appellant filed a motion styled as a "Motion For Order Permitting Discovery of Transcript, Exhibits, or Other Memorialization of the Grand Jury Proceedings and a List of Grand Jury Members." (C.R.131-33.) During a pretrial motion hearing, the following exchange took place:
"MR. DIGIULIAN [defense counsel]: Judge, ... we filed a motion to discover grand jury testimony. The State, as I understand it, says that there is none. There is no testimony, evidence, exhibits or anything of the sort, and they will go on the record representing that to us that no record of any testimony of the proceedings exists, but if there is, that they will provide it. Is that correct, Paul?
"MR. MATTHEWS [prosecutor]: That's correct.... [T]here was testimony given, of course, at the grand jury, but we [didn't] have a court reporter present. There are no tape recordings. There are no written documents taken or made at the time. There are no nothing, no kind of memorialization is made of their testimony.
"THE COURT: So thatin effect, that motion is moot.
"MR. DIGIULIAN: If their representation is correct, yes sir.
"THE COURT: Well, that is what you are representing.
"MR. MATTHEWS: Yes, sir.
"THE COURT: We'll show the motion is moot, based on the representation of the district attorney."
(R. 6-8.)
The appellant now contends that the failure to record the grand jury proceedings *258 constitutes reversible error. Specifically, he alleges that "[t]he failure to record the grand jury proceedings denied" him his right to adequately "cross-examine and impeach witnesses testifying against him, to identify constitutional errors related to the grand jury, and to an adequate appellate record." (Appellant's brief, p. 36.)
We find no plain error in the failure to record the grand jury proceedings. Alabama law does not require that grand jury proceedings be recorded. Section 12-17-275, Code of Alabama 1975, provides "[w]hen directed by the judge" an official court reporter "shall attend the investigations of the grand jury and there take such notes of the testimony as directed by the district attorney or foreman." (Emphasis added.) Furthermore, even if the grand jury proceedings should have been recorded, the appellant did not make the requisite showing that he was entitled to inspect the transcript of those proceedings. See Arthur v. State, 711 So.2d 1031 (Ala.Cr. App.1996), aff'd, 711 So.2d 1097 (Ala.1997).

E.
The appellant claims that the trial court erred in denying his motion to require that the jury venire complete a questionnaire. We disagree. As the appellant acknowledges, "[a] trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion." Ex Parte Land, 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). See also Burgess v. State, 723 So.2d 742 (Ala. Cr.App.1997), aff'd, 723 So.2d 770 (Ala. 1998); Harris v. State, 632 So.2d 503 (Ala. Cr.App.1992), aff'd, 632 So.2d 543 (Ala. 1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we find no abuse of discretion in this regard.

F.
The appellant maintains that the trial court improperly denied his "motions regarding information about prospective jurors." (Appellant's brief, p. 40) Specifically, he contends that the trial court should have granted his motions styled as a "Motion to Require Disclosure of Any and All Prospective Jurors that May be Favorable to the Defense" and as a "Motion to Require State to Provide Information on Past Jurors." There is no merit to this assertion. See Arthur v. State, supra; Burgess v. State, supra.

VIII.
The appellant alleges that the "state improperly presented testimony that [he] was allegedly an accomplice to an unrelated burglary." (Appellant's brief, p. 41.) We disagree.
"The appellant cannot be heard to complain `"about exploration of the issue... which he himself improperly injected into the trial." [Morgan v. State, 440 So.2d 1240, 1241 (Ala.Cr.App.1983)]. "Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court. Vincent v. State, 231 Ala. 657, 165 So. 844 (1936); Jones v. State, [362 So.2d 1303 (Ala.Cr.App.1978)]; Norris v. State, 429 So.2d 649 (Ala.Cr.App.1982)." Peterson v. State, 452 So.2d 1372 (Ala. Cr.App.1984).' Campbell v. State, 508 So.2d 1186, 1189 (Ala.Cr.App.1986). `The state may examine a witness on redirect as to matters injected into a case on cross-examination by the defense.' Hollingsworth v. State, 549 So.2d 110, 111 (Ala.Cr.App.1988), and cases cited therein."
Walker v. State, 631 So.2d 294, 301 (Ala. Cr.App.1993). See also Stallworth v. State, 662 So.2d 1222 (Ala.Cr.App.1995); Sistrunk v. State, 630 So.2d 147 (Ala.Cr. App.1993).
The admission of the evidence of an unrelated burglary was not improper; *259 the testimony elicited by the appellant on cross-examination opened the door for the prosecution's line of questioning. On direct examination, the state elicited testimony that Beverly Robinson, the appellant's half-sister, had contacted the sheriff's department and had turned the appellant in for the murder of Dalton Pace. She agreed to cooperate with law enforcement officials. (R.2034.) In her conversations with those officials, she revealed that she and Rex Segars, her common-law husband, had stolen property in their house. Robinson and Segars were subsequently arrested for a variety of crimes resulting from the search of their house. Robinson testified that in return for her truthful testimony in this case, the state had agreed to dismiss the charges against her. (R.2034-35.) In addition, Robinson agreed to wear a concealed microphone and to engage in a conversation with the appellant. (See Part XV of this opinion for a discussion of the admissibility of Robinson's testimony regarding her conversation with the appellant.)
During Robinson's conversation with the appellant, she mentioned a newspaper article she had read reporting Pace's murder. The appellant admitted that he had known Pace and that he had purchased some parts from Pace. The appellant then accidentally told Robinson, "[h]e was a big fucker.... I realized that when he grabbed my arm and ripped my sleeve." (R.2039.)
On cross-examination, defense counsel questioned Robinson about the circumstances surrounding the stolen property in her house. In addition, defense counsel questioned Robinson about her tape-recorded conversation with the appellant. In response to defense counsel's questions about the conversation, Robinson testified that during the conversation she pretended to suspect that Segars might be involved with the murder of Pace in the hope that the appellant would admit his involvement. When she expressed concern over Segar's and her arrest, the appellant reassured her that their arrests involved only the stolen merchandise in their home. (R.2058.)
During the state's redirect examination of Robinson, the following occurred:
"Q [prosecutor]: How was it that Gary knew so much about these thefts that were involving y'all and the stolen property in your house?
"A: How did he know about them?
"Q: Yes, ma`am.
"A: Well, number one, he knew Robbie Fayard enough to tell us when Robbie wasn't at home
"MR. DIGIULIAN [defense counsel]: Judge, we're going to object to this. This isthis goes in
". . . .
"MR. DIGIULIAN: This goes in to what we have filed in our motion in limine.
"MR. MATTHEWS: I didn't ask about it, Judge. They opened the door and asked about this whole situation and went into all the details.
"THE COURT: I'm going to overrule. Y'all did. Y'all opened the door. I'll allow him to go into it.
"(BY MR. MATTHEWS): Go ahead, you can answer. Go ahead and tell us how
"A: Repeat the question.
"Q: Tell us how Gary Drinkard knew so much about all this stolen property in y'all's house.
"A: He knew the people well enough to tell us when they weren't home.
"Q: Beg your pardon?
"A: He knew the people well enough to tell us when they weren't home.
"Q: So in other words, he helped set the burglary up?
"A: Yes, sir.
"Q: He told y'all when he wouldn't be there?
"A: Yes, sir.

*260 "Q: What about this other stolen property that was in y'all's house?
"A; I knew the other lady. I knew she wouldn't be home.
"Q: So you knew about that one?
"A: Yes, sir.
"Q: He didn't have anything to do with that one?
"A: No, sir."
(R.2065-67.)
Because the defense injected the issue of the appellant's knowledge of the stolen property in Robinson and Segar's house, the state did not err in questioning Robinson as to how the appellant knew about the stolen property. Accordingly, no reversible error occurred.

IX.
The appellant claims that the prosecution used its peremptory challenges to remove certain members of the venire solely because of their race and gender, thereby violating Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Specifically, the appellant alleges that the prosecution "used peremptory strikes to eliminate four of the six black people on [the] jury venire" and "also used peremptory strikes to eliminate six women from the jury venire." (Appellant's brief, p. 45).
The record reflects that after the selection of the jury the following lengthy discussion transpired:
"THE COURT: All right. Go ahead and make your challenge at this time, please, sir.
"MR. DIGIULIAN [defense counsel]: Judge, with respect to Juror Number 39, F.L., Mr. L. is a member of a cognizable class, [a] minority. In reviewing my notes, he indicated that he was single. Dexter Elliot is a cousin, or, is his cousin with the Decatur Police Department. I find nothing in my notes that indicates he was other than a good, responsible juror and in regard to Mr. L, he was struck solely for racial reasons.
"THE COURT: Well, go aheadgo ahead and tell me the whole thing. I'm not going to have the State respond until Iyou go through and tell me all your challenges, and then we'll decide whether or not there's a
"MR. DIGIULIAN: I think hethat particular juror also knew Nathan Pratt. In addition, the State struck Juror S.S. She was a member of two distinct groups, both as a black and as a woman. Shemy notes again indicate that she testified that she worked at aone of the plants that sued her husband, and no evidence that any of them had been victims of a crime or had any hard feelings toward the State or anything of that nature. And again we believe that, in particular with her, that a strike in that instance was solely based on the grounds of sex and race. Those are the only two challenges, I believe, we have. I'm sorry, and Number 27, S.T. She is also a member of two cognizant groups. She's black; she's female. She answered the questions posed to her intelligently and thoughtfully and appeared to understand what was going on. She testified she could follow your order and your instruction, and she was awill be an alternate, but still, she was struck and unless something happens to a juror, she will not serve. In addition, the State also struck N.T., and there was no evidenceMr. T's questions were all answered in such a way that indicated that Mr. T. waswould do nothing but render a fair verdict based on the evidence. Of the six blacks on the jury, four were struck. I don't have a count of the women who were struck. We those are our challenges at this time, Judge.
"THE COURT: I'll allow you to make a response, if you choose, Mr. Matthews, just simply to the question of whether or not there is an inference of discrimination with respect to either the striking of *261 blacks or the striking of females that have been named by the defendant. And I'm not telling you you've got to respond, that's
"MR. MATTHEWS [prosecutor]: Yes, sir.
"THE COURT: I'm not asking you to give justification.
"MR. MATTHEWS: I understand, Your Honor. I read and study every case that comes out of the appellate courts about whether or not I should respond and put those on the record, Your Honor. I don't know what position the law would be in with these cases getting here. I'd rather put my reasons on the record, if I could as to the racial I guess I need to look at it a minute to try to determine what the male and female strikes were. If I can have another minute on that, but on the racial issue, the blacks that were struck, Your Honor, I'd like to respond
". . . .
"MR. MATTHEWS:and give notice about the reasons.
"THE COURT: Here are thehere's my view of it at this point, and I pretty well saw what was coming pretty quick. First of all, with respect to your challenge based on gender with respect to Ms. S. and Ms. T., Jurors Number 21 and 27, it is my finding that there is no inference of purposeful discrimination on behalf of the State based on gender with respect to those two jurors. Now, with respect to Juror Number 39, F.L., Juror Number 21, S.S., Juror Number 54, N.T., and Juror Number 27, Ms. T, I've looked back at, ironically, at Tates v. State, and the original opinion we got out there, and they said that in that case where the State apparently struck four blacks out of six, that supplied an inference of discrimination. So for that reason, I find that there is an inference of discrimination and I will call upon the State to supply a race neutral reason, if any exists, for the striking of those four blacks.
"MR. MATTHEWS: I'm going to Number 39, Mr. L., Mr. L. has a criminal charge against him and his response according to a police officer that he did not report under questioning. And maybe that the way the questions were phrased to him, he didn't feel like he needed to report that to the Court, but I'm not sure we always ask about the minor offenses, and this is a minor offense, so that wouldn't be necessarily he'd be saying something improper. He's not answering the questions. But with a criminal charge such as this, your Honor, where he stated something falsely to a police officer, I feel like would be a real problem for somebody that we would want as a juror. Most importantly, on this juror, though, your Honor, is that his questions, when I initially questioned him on the death penalty, he answered that he would require absolute proof on the death penalty issues. And I think, after that somewhat, he backed down and he may have been rehabilitated to the point where he couldn't have been challenged for cause, Your Honor, but I felt like based on the answers that he had given, his inclination, it was his idea ... that he would want to hold the State to absolute proof on the death penalty issues.
"Ms. S. answered, basically, she's number 21, answered more or less the same way. She was on the same panel, and that she answered that in capital murder cases, she would require the State to convict the defendant or prove the case beyond all doubt. When questioned further about that, she stated she came back on that somewhat, your Honor, but it seemed to me that basically her opinion in that area was that thein the issue of the death penalty, was going to be something she was going to require the State to prove beyond all doubt or to an absolute certainty. Skip Ms. T. I think she was the next one mentioned.

*262 "Mr. T, Your Honor, he's a talk-show host at a local radio station, and I think he's familiar with a good many people here. He has a brother who ishas been convicted of a number of offenses, L.M. I think he's a half-brother. He had a response that I didn't really particularly understand about when he said that he would have to hear the facts in the case on whether or not to believe the police, and itI think when he says that, that what he was talking about was not the general kind of answer about matching the facts to everybody else. And it seemed to me that the way that he was answering the question, that he seemed to be saying that he had some problem with believing the police. Maybe not. Maybe that was the way I was hearing it, Your Honor. But the most important thing with Mr. T. is that, within the last year, the Decatur Police Department has been taking an aggressive position where when they serve search warrants on houses where drugs are found and stuff like that, they bring the housing department in and several of the houses have been shut down. Mr. T. has been the owner of a number of those houses, and as result of that, has gotten into a fairly heated dispute with the City of Decatur over their drug enforcement and law enforcement practices involving that. It appeared in the newspaper a number of times where he's had difficulties with the police department's practices and his views on that. And I justMr. T didn't answer anything about that in here, but I just feel like with that background, with him being in a sort of running dispute with the Decatur Police Department, that would likely affect the way he would look at the issues in this case, where it being as Mr. DiGiulian has pointed out several times, a case where many Decatur Police Officers are involved or would be involved as witnesses.
"Ms. T., Your Honor, I don't know whether I would view her as a strike or not. She, of course, is the last strike and somebody that may end up on the jury because she is in the position of being an alternate. The reason that I placed her in this position is that she sat on a jury on a previous time and was unable to reach a decision. It was a civil jury that she sat on eight or nine years ago. Sometimes those peoplewe don't know, of course, or not, she may have been the problem in holding up that jury or may have been one of the majority or whatever. But I don't know, the people in the past that have sat on a jury, sometimes they may have difficulty reaching an accord with other people. Your Honor, she answered some questions, of course, in our favor is one of the reasonsshe said that, in her answers, that she felt the defendant must prove his innocence, but she also answered very strongly, it seemed to me much stronger than the way the other jurors were answering, that the State must prove the defendant guilty. She talked about she had a brother murdered in Atlanta, but that nothing happened about it, and then she testified that she didn't reallyshe didn't really seem to have any kind of problem with that, and that seemed an odd reaction to me. But on the whole, Your Honor, I just felt unsure about her and that's why I placed her in the position of being an alternate is that although she had somesome answers clearly that were favorable to the State and some clearly favorable to the defendant. And I justI didn't feel like she was somebody I needed to remove from any possibility of being on the jury, but also somebody that I had some misgivings or some qualms about whether or not she would be favorable for the State.
"Your Honor, I point out that there are two or moretwo, I guess, jurors that remain on the panel, will be on the jury, that are black. One is male and one is female, and then our view is, Ms. T., as being in a position where she ultimately may end up on the jury.

*263 "THE COURT: Ido you want to make a brief response to any of that?
". . . .
"MR. DIGIULIAN: Judge, regarding F.L., there's nothing on the record that indicates, nothing that indicates that any of Mr. L.'s responses were other than truthful. Mr. L., I can assure you he was rehabilitated or Mr. Matthews would have made a strike for cause, attempted a strike for cause, and I don't believe that was the case. I think there was no strike for cause for him, there was no strike for cause motion made on Ms. T. So the State must have felt that they have been rehabilitated with regard to their answers on the death penalty.
"THE COURT: All right. I have looked at my notes, and my notes are consistent with what Mr. Matthews said. As a matter of fact, I had an asterisk in my notes concerning Mr. L., wondering exactly what he was telling us. I find that the State has given a sufficient race-neutral reason for striking Juror Number 39, F.L. And I overrule your challenge as to him. What about Number 21, S.S.?
MR. DIGIULIAN: Judge, my notes reflect that there [were] absolutely no statements made by her in response to questions by me or by Mr. Matthews I'm trying to rememberthe only thing that she testified about was where her she and her husband both worked at Wayne's Farm. There was no challenge for cause for her, as I recall, from the State. I think Mr. Matthews talked about she would have to have additional proof beyond a reasonable doubt, and I think that she was adequately rehabilitated if there was any reason for strike for cause there. She said that all she would have to do is she would follow her oath and follow her instructions as you would give them to her.
"THE COURT: Well, again, I've looked back in my notes and I find that the State has also given a race-neutral reason for striking Juror Number 21, S.S., and I'll overrule your challenge.
"MR. DIGIULIAN: Judge, with regard to N.T., I don't know anything about what Mr. Matthews is talking about as far as his ongoing problems with the City of Decatur. Again, we'd be in the same position as with Mr. L., items based on the things that are not in the record.
"THE COURT: Well, again, I find that the State has given a sufficient race-neutral reason for the striking of Juror Number 54, Mr. N.T., and I'll overrule your challenge as to him. Now, we come down to Ms. T., who is an alternate and if one of the other twelve were to go off, she would be the first one to replace any other juror as an alternate...."
(R. 1489-1503.)
A lengthy discussion then transpired as to whether the striking of an alternate juror by the prosecution is subject to a Batson challenge.[5] At the conclusion of the discussion, the trial court concluded that even if the prosecution's strike of Ms. T. was subject to a Batson challenge, the appellant's challenge was due to be denied because, it found, the prosecution's explanation for striking Ms. T was race neutral. (R. 1506.)
"`"The trial court evaluates an objection to the use of peremptory challenges under the three-step analysis set forth in Batson. First, as we have said, a defendant must make a prima facie showing that the state has exercised a peremptory challenge or *264 challenges on the basis of race or gender. Second, once a prima facie showing has been made, the burden shifts to the state to articulate a race-or gender-neutral explanation for striking the prospective jurors in question that is related to the case to be tried. Batson, 476 U.S. at 98, 106 S.Ct. at 1723-24. The United States Supreme Court recently stated in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), that the second step does not demand an explanation that is persuasive or even plausible. It stated that a legitimate explanation is not necessarily one that must make sense, but one that does not deny equal protection. At this step of the inquiry, the issue is facial validity of the prosecutor's explanation, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed neutral. Id., at 768, 115 S.Ct. at 1771. When the defendant challenges as pretextual the prosecutor's explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991). In the third step, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the explanations, and it is also at this stage that `implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' Purkett, 514 U.S. at 768, 115 S.Ct. at 1771."
"`Bush v. State, 695 So.2d 70, 96 (Ala. Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997).
"`A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala. 1987); Ex parte Thomas, 659 So.2d 3 (Ala.1994); Lynn v. State, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989).'
"Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996).
"`"[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."'
"Davis v. State, 555 So.2d 309, 312 (Ala. Crim.App.1989), quoting Powell v. State, 548 So.2d 590 (Ala.Cr.App.1988)."
Fletcher v. State, 703 So.2d 432, 435-36 (Ala.Cr.App.1997).
The prosecutor's explanations were facially race-neutral. Although the defense offered some rebuttal, the trial court apparently found that the appellant had not met his burden of proving purposeful discrimination. After reviewing the record, we cannot say that the trial court's denial of the appellant's challenge to the prosecution's strikes of four black venire-members was clearly erroneous.
As noted, the appellant also contends that the prosecution improperly used six of its peremptory strikes to remove female veniremembers.
"In J.E.B. v. Alabama, the United States Supreme Court extended the principles of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to apply to gender discrimination in jury selection. A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, *265 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender."
Ex parte Trawick, 698 So.2d 162, 167-68 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997).
Although the appellant claims that the state used six of its peremptory strikes improperly to remove female veniremembers, the appellant objected only to the prosecution's use of two of its strikes to remove female veniremembers. The trial court found that the removal of those two female veniremembers did not establish a prima facie case of gender discrimination. This finding is not clearly erroneous. The appellant
"offered no evidence that the female veniremembers shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent to discriminate against female jurors, that there was a lack of meaningful voir dire directed at the female jurors, or that female jurors and male jurors were treated differently. He has offered no evidence that the prosecutor had a history of using peremptory challenges in a manner that discriminated against veniremembers of either gender .... Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination."
Trawick, 698 So.2d at 168. (Emphasis in original.)
As to the other four female veniremembers struck by the state, we have reviewed the record and find no inference "that the prosecution engaged in purposeful discrimination against ... women in its use of peremptory challenges." Smith v. State, 756 So.2d 892, 915 (Ala.Cr.App. 1997).

X.
The appellant contends that the trial court erred in granting the prosecution's challenges for cause of two prospective jurors, based on their opposition to the death penalty. The appellant suggests that despite the prospective jurors' views on capital punishment, each juror indicated that he or she could follow the trial court's instructions and consider the imposition of the death penalty.
"`"There are a number of recent United States Supreme Court cases on this point which are controlling authority. The original constitutional yardstick was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Court required that the juror make it unmistakably clear that he would automatically vote against capital punishment and that his feelings would prevent him from making an impartial decision as to guilt. This is *266 no longer the test. Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), ruled that only those jurors whose [views] on capital punishment would prevent or substantially impair the performance of their duties could be challenged for cause. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), held that the test for excluding a venireman is whether the juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and oath. The Court expressly stated that the juror's bias did not have to be proved with unmistakable clarity. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), stated in part as follows:
"`"`The precise wording of the question asked of [the venireman] and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstances recommend the death penalty. But Witt recognized that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." [469] U.S. at [424, 105 S.Ct. at 852]. The trial court, "aided as it undoubtedly was by its assessment of [the venireman's] demeanor," at [434, 105 S.Ct. at 857], was under the obligation to determine whether [the venireman's] views "would prevent or substantially impair the performance of his duties as a juror," id., at [433, 105 S.Ct at 857]....'"'
"`"The Eleventh Circuit Court of Appeals held in 1983 in McCorquodale v. Balkcom, 721 F.2d 1493 (11th Cir. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984), that a prospective juror who responded to the death penalty questions, `I don't think I could do it. I really don't,' has made it sufficiently clear that she could not impose the death penalty regardless of the evidence....
"`"The Fifth Circuit in Martin v. Maggio, 711 F.2d 1273 (5th Cir.1983), even held that the following equivocal responses would establish the necessary predicate for disqualification: `I don't know if I would vote for the death penalty.' and `I don't know if I could do it.' These are all euphemistic expressions of `no.'"'
"Nichols v. State, 624 So.2d 1328, 1335-36 (Ala.Cr.App.1992), quoting Watkins v. State, 509 So.2d 1071, 1073-74 (Ala. Cr.App.1986), affirmed, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). See also Brownlee v. State, 545 So.2d 151, 155-56 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath."' Wainwright v. Witt, 469 U.S. 412, [424], 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648, [658], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proven with `unmistakable clarity' because `juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.' Id.

*267 "`"A trial judge's finding on whether or not a particular juror is biased `is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. `A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."'
"McWilliams v. State, 640 So.2d 982, 999 (Ala.Cr.App.1991), affirmed in part, remanded on other grounds, 640 So.2d 1015 (Ala.1993), quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
"`In determining whether a veniremember's views might prevent or "substantially impair the performance of his duties as a juror," ... a trial court is aided by being able to observe the potential juror's demeanor and tone in responding. There is no special phrase that will resolve the indecisiveness of a potential juror's responses.' Rogers v. State, 638 So.2d 1347 (Ala.Cr.App.1992), citing Watkins v. State, 509 So.2d 1071, 1073 (Ala.Cr.App.), affirmed, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
"`"[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made `unmistakably clear'; these veniremen may not know how they will react when faced with imposing the `death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. This is why deference must be paid to the trial judge who sees and hears the juror."'
"Coral v. State, 628 So.2d 954, 970 (Ala. Cr.App.1992), after remand, 628 So.2d 988 (Ala.Cr.App.1992), affirmed, 628 So.2d 1004 (Ala.1993)[,] quoting Wainwright v. Witt, 469 U.S. at 424-26, 105 S.Ct. at 852-53 (footnote omitted)."
Jackson v. State, 674 So.2d 1318, 1340-42 (Ala.Cr.App.1993), aff'd. in part, rev'd in part, 674 So.2d 1365 (Ala.1994). See also Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
As noted above, "[d]espite [the] lack of clarity in the printed record ... there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Jackson, 674 So.2d at 1342, quoting Coral, 628 So.2d at 970. After reviewing the record of the voir dire examination of each of the two prospective jurors, we are convinced that this is such a situation. Although the prospective jurors' responses wavered depending upon how the questions were posed and by whom, the overall impression from the record is that because of their opposition to the death penalty, the two prospective jurors would not recommend imposition of the death penalty, even if the evidence warranted it. Furthermore, in addition to being able to listen to the prospective jurors' responses to various questions, the trial court also had the opportunity to observe the prospective jurors' demeanor, body language, and tone of voice. Accordingly, we find no abuse of discretion in the trial court's removal for cause of the two prospective jurors.

*268 XI.
The appellant claims that his conviction should be reversed because of what he alleges was prosecutorial misconduct. He divides this argument into seven parts, which we will address separately below. We note that the appellant did not object to much of the claimed misconduct.
In evaluating the propriety of prosecutorial arguments, this Court has stated:
"`"This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).'
"Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
". . . .
"As the United States Supreme Court stated in Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986):
"`[I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'
"(Citation omitted.)
"We must evaluate the comment in the context of the entire proceedings.
"`"Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), aff'd, 585 So.2d 112 (Ala.1991). See also Ward v. State, 440 So.2d 1227 (Ala.Cr.App. 1983). "The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." ... Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App.1986).'
"Williams [v. State], 601 So.2d [1062,] at 1072-73 [(Ala.Cr.App.1991)]. `"[C]ounsel in the trial of any lawsuit has the unbridled right (to be sure, duty) to argue the reasonable inferences from the evidence most favorable to his client."' Kuenzel, 577 So.2d at 492, quoting Ex parte Ainsworth, 501 So.2d 1269, 1270 (Ala.1986). (Footnote omitted.)... `"Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence."' Kuenzel, 577 So.2d at 493, quoting Arant v. State, 232 Ala. 275, 279, 167 So. 540, 543 (1936)...."
Burton v. State, 651 So.2d 641, 651-52 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). See also Mason v. State, 768 So.2d 981 (Ala.Cr. App.1998).

A.
The appellant alleges that "[t]he prosecutors prejudicially contrasted [his] constitutional rights with the rights of the victim." (Appellant's brief, p. 50). We disagree.
The appellant's contention stems from a comment the prosecutor made during the voir dire examination of the first panel of potential jurors. During the voir dire, the prosecutor stated:
"May it please the Court. Ladies and gentlemen, as the Judge told you, my name is Paul Matthews, and I am the prosecutor for the State of Alabama, for Morgan County. The people at the table here with me, as the Judge told you, are Gary Walker, a Sergeant in the Decatur Police Department, and Andrea *269 Elmes, that's the daughter of the victim in this case. I want to re-emphasize what the Judge has told you about feel free to speak up when we ask you these questions and to answer them. I know when I sat on jury duty and sat there and the lawyers would go through the questions, since I had been a practicing attorney for a few years, I knew lots of people involved and lots of police officers and attorneys, and after you answer a couple of questions, you start feeling kind of self-conscious. Every time they ask questions, I started thinking every time I raise my hand, they are going to think I am nuts because I have an answer to every question. Please feel free to answer every single question that applies to you or that might apply to you. As the Judge told you, this is a case where the ultimate penalty that is in our legal system that is possible may be imposed, and that is the death penalty in this case. It is a serious case for, of course, the defendant in this case, because he faces that, and, of course, a serious case for the State of Alabama for Mr. Pace's family, and this is their day in court, as well."
(R. 541-42.) (Emphasis added to highlight the portion of the quoted material the appellant finds objectionable.)
The appellant contends that the prosecutor's comment "was tailored not to focus on the record and its reasonable inferences, but to improperly draw negative attention to appellant's exercise of his constitutional right to a fair trial." (Appellant's brief, p. 51.) There is no merit to this assertion. When the allegedly objectionable comment is viewed in context, it is clear that the prosecutor was not expressing "disdain for [the appellant's] exercise of his constitutional rights by comparing his rights to those of the victim" (appellant's brief, p. 50); rather, the prosecutor was instructing the veniremembers of the seriousness of the case and instructing them to answer each question propounded to them fully and completely. Accordingly, we find no plain error in the prosecutor's comment.
The record reflects that the victim's daughter was permitted to sit at the prosecution table. (R. 520-21.) In one sentence, the appellant also claims that "by permitting the victim's family members to sit at counsel table pursuant to the Alabama Crime Victims Court Attendance Act, Ala.Code § 15-14-50(1975), ... the Court exacerbated the problem of jurors believing that they were either ruling for or against the victim." (Appellant's brief, p. 51.) No error, plain or otherwise, occurred in allowing the victim's daughter to sit at the prosecution table. Alabama law permits a representative of the victim to be present at counsel table. See, §§ 15-14-53 and 56(a), Code of Alabama 1975.

B.
The appellant alleges that the "prosecutor improperly told the jury to disregard the presumption of innocence and the state's burden of proof." (Appellant's brief, p. 51.)
During opening arguments, the prosecutor stated, in relevant part:
"He [the appellant] shot Mr. Pace two times in the back after shooting him in the chest. He then robbed him of a substantial amount of money, left with it, and I think as one of the neighbors testifies, scratching off or peeling off or something like that as he pulled out of the driveway. That boils down to what we're here about, ladies and gentlemen, and I'll tell you some more about what the evidence we expect in the rest of the case, but that boils down to what we're here about. Gary Wayne Drinkard murdered and robbed Dalton Pace. And what we're here about is whether or not that's true. We talk a lot about reasonable doubt and we talk about all these different processes and being presumed innocent and things like that. What the question comes down to is, is that a true statement? Can you believe that?

*270 When you get to the end of the case if you believe that that is true...."
(R. 1526-27) (Emphasis added to highlight the portion of the quoted material the appellant finds objectionable.)
The appellant did not object to the above comment, and we find no plain error in the prosecutor's comments. Contrary to the appellant's assertion, it does not appear that the prosecutor was telling the jury to "disregard the presumption of innocence and the state's burden of proof."

C.
The appellant claims that the prosecutor inappropriately asked a defense witness why the witness had not come forward with information to help the prosecution, and also asked improper questions about a missing witness. Both of these assertions stem from questions asked by the prosecution during its cross-examination of Kelly Harville, the appellant's adopted daughter.
On direct examination, Harville testified that she was with the appellant at their home on the night of the murder. Harville also testified that her mother was not at home that evening because her mother had gone to visit a friend. During the prosecution's cross-examination of Harville, the following occurred:
"Q: How long have you known that August 18 was the day that your father was accused of having done this murder?
"A: I don't know.
"Q: About how long? A year, two years, something like that?
"A: I'm not really certain.
"Q: Do you remember when he got arrested?
"A: Yes, sir.
"Q: Was it sometime around that time when he got arrested that you found out he was accused of having done a murder on August 18?
"A: Yes, sir.
"Q: It was sometime around September then of 1993; is that right?
"A: Yes, sir.
"Q: So would it have been in September of 1993 that you first went to the police and said, `My father couldn't have done this murder, he was home all night with me'?
"A: No, sir.
"Q: Did you go in September of '93?
"A: No, sir.
"Q: Have you ever been to the police since that time and said my father couldn't have done this, he was home all night with me?
"A: No, sir.
"Q: Have you ever gone to the D.A.'s office and told that?
"A: No, sir.
"Q: Have you ever gone to the newspaper and told that?
"A: No, sir.
"Q: When's the first time you ever told it to anybody other than the defense attorneys? Today here in court?
"A: No. I don't understand the question.
"Q: Did you ever tell the police?
"A: No, sir.
"Q: The D.A.'s office?
"A: No, sir.
"Q: The newspaper?
"A: No, sir.
"Q: T.V.?
"A: No, sir.
"Q: Have you told it to anybody anywhere in public other than in the courtroom today, here for the first time?
"A: I talked to the lawyers about it.
"Q: To the lawyers about it. When did you talk to them?
"A: I'm not really sure.
"Q: Well, give us an idea.

*271 "A: Three or four months ago. I'm not for sure. I don't know. I'm not real sure."
(R. 2535-38.)
The appellant argues that "[d]efense witnesses have no obligation to disclose the theory of defense to the district attorney's office or the newspaper before trial"; therefore, he claims, "[s]uggesting to the jury that it should draw a negative inference from a defense witness's failure to assist the prosecution's case infringed on [his] right to prepare and present a defense." (Appellant's brief, p. 55.) The appellant did not object to this line of questioning.
We find no plain error in the prosecutor's questions. The prosecutor was properly allowed to test the credibility of the witness. Whether the witness had previously disclosed to the authorities that she was with the appellant on the night of the murderinformation that was potentially beneficial to the appellant's casewas relevant to the credibility of her claim.
Later, in the cross-examination, the following occurred:
"Q: Where was your mother that night, on the eighteenth?
"A: I believe she went to visit a friend.
"Q: Do you know the friend's name?
"A: Belinda Brown.
"Q: Belinda Brown. Is Ms. Brown here?
"A: No, sir."
(R. 2542.) The appellant did not object to this line of questioning.
The appellant alleges that the prosecutor was improperly permitted to comment on a "missing witness." It is true that as a general rule, "a party may not comment unfavorably on the other party's failure to call a witness equally available to both sides," Weaver v. State, 678 So.2d 260, 279 (Ala.Cr.App.1995), rev'd on other grounds, 678 So.2d 284 (Ala.1996); however, because Ms. Harville had not been forthcoming about her version of what happened on the night of the murder, the potential witness was not equally available to both sides. Accordingly, we find no plain error in the prosecutor's questions.

D.
Next, the appellant claims that the prosecutor improperly expressed his personal opinion about the evidence. The basis of his contention is twofold.
First, he claims that the prosecutor improperly expressed his opinion about the credibility of the state's witnesses during the following portion of the voir dire examination:
"[PROSECUTOR]: In cases dealing with these kinds of issues, of course, the State takes it very seriously to try and prosecute who we believe are the persons responsible for these type crimes. To do that sometimes the witnesses that we have to use in these cases are not people that we would go out and select to be witnesses to crimes or to acknowledge about things that we want to know about. In this particular case, there will be four people that will testify in this case that have problems with the law, that as part of our agreement to get them to testify in this case, we have agreed to, some people refer to as, make deals with or agree to, on some of the people, to let them plead guilty to some number of charges, maybe reduce the charges in some instances, and other people to dismiss some cases. I'll set out for you what those kind of things are as we go through these questions and ask about them, but is there anybody, just in sort of a general feeling that, if the State has made deals with people to get them to testify in cases like this, it doesn't matter what else we're going to say or what we're going to do, you're just not going to be able to convict somebody if the evidence we're going to look at is going to come from people that *272 we made deals with. Is there anybody who has that strong feeling about it?
". . . .
"PROSPECTIVE JUROR A.: Do you mean if they'reif they were in the same situation and you're just telling them that you were not going to run them in
"MR. MATTHEWS [prosecutor]: In this case, not in the same situation. As far as we know, we believe they did not participate in this crime or even a crime close to this magnitude, but they do have other criminal charges
"PROSPECTIVE JUROR A.: Okay.
"MR. MATTHEWS:against them. Would you have a problem?
"PROSPECTIVE JUROR A.: No.
"MR. MATTHEWS: Put it like this. You're entitled, being a juror, to take into account that somebody's got a criminal history, about certain crimes, and you're also entitled to take into account that we've made a deal with them to get them to testify, and that's something that would be fair for you to know so that you can make a determination whether or not somebody is telling the truth. But is there anybody just once you hear that, that they've made a deal or something like that, you're not going to hear anything else they've got to say?"
(R. 585-87.)(Emphasis added to highlight the portion the quoted material the appellant finds objectionable.)
The appellant contends that the prosecutor's response
"was highly prejudicial because the state's case hinged entirely on the credibility of its witnesses and all of the state's key witnesses were prior criminals. The jurors thus could have believed that the witnesses were testifying against [the appellant] to avoid being prosecuted for the murder in this case. Instead of having the jury draw this inference, however, the prosecutors improperly encouraged the jurors to substitute prosecutorial opinions for their own."
(Appellant's brief, p. 56-57.)(Emphasis added.)
The appellant did not object to the prosecutor's comment, and we find no plain error in the comment. When the comment is viewed in context, it is apparent that the prosecutor was not vouching for the credibility of the state's witnesses; rather, he was honestly answering the prospective juror's question. To suggest that absent the prosecutor's comment, the prospective jurors might have inferred that the witnesses were testifying against the appellant to avoid being prosecuted for the murder of Dalton Pace is quite a stretch. There was never any contention that any of the witnesses were involved in the murder. Furthermore, the terms of the plea agreements were fully disclosed to the veniremembers during voir dire.
The appellant also alleges that the prosecutor improperly argued his personal beliefs to the jury during closing arguments at the guilt phase of the trial. In support of this assertion, he refers this Court to instances during the prosecutor's argument where the prosecutor prefaced his remarks with phrases such as "I know" or "I think." (R. 2689; 2740.)
"`While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence. See Woods v. State, 19 Ala.App. 299, 97 So. 179 (1923); Mitchell v. State, 50 Ala.App. 121, 277 So.2d 395, cert. denied, 291 Ala. 794, 277 So.2d 404 (1973); Mainor v. State, 339 So.2d 147 (Ala.Crim. App.1976).'
"Sams v. State, 506 So.2d 1027, 1029 (Ala.Cr.App.1986)."
*273 Wilson v. State, 652 So.2d 778, 781 (Ala.Cr. App.1994).
We have examined the instances the appellant cites, as well as the context of the comments in the entire closing argument, and we find no plain error. The prosecutor was not expressing his personal opinion as to the appellant's guilt; he was merely giving his impression of the evidence. The fact that the prosecutor prefaced some of his comments with "I know" or "I think," or a similar expression, does not render the comments improper.
"In Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), the Alabama Supreme Court stated:
"`Furthermore, we view those comments that the prosecutor prefaced with "I think," "I believe," "I feel," "I am satisfied," and "I have no doubt," as expressing his reasonable impressions from the evidence.... We note, however, that even if these comments were to be viewed as expressions of the prosecutor's personal opinions and, thus, as "crossing the line" as permissible argument, they, nonetheless, would not constitute reversible error.'
"See also, Boyd v. State, 715 So.2d 825 (Ala. Cr.App.1997)."
Roberts v. State, 735 So.2d 1244, 1254 (Ala. Cr.App.1997). See also Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998).

E.
The appellant maintains that the "prosecutors misled the jury by arguing facts not in evidence." (Appellant's brief, p. 80.) In support of his contention, he refers this court to three separate remarks made by the prosecutor, none of which warranted an objection.
We have reviewed the comments, and we find no plain error. One of the comments did not even occur in the presence of the jury; thus there was no possibility that it prejudiced the jury. Even so, the prosecutor's comment during the sentencing hearing before the judge that there were no mitigating circumstances did not constitute reversible error. The prosecutor was arguing that based upon the evidence, death was the appropriate sentence.
In the remaining two comments, the prosecutor was simply expressing his impressions from the evidence presented. Furthermore, even if the comments were erroneous, they do not warrant reversal because the comments did not infect the trial "with unfairness as to make the resulting conviction a denial of due process." Burton, 651 So.2d at 651-52, citing Darden v. Wainwright, 477 U.S. at 181, 106 S.Ct. 2464.

F.
The appellant contends that "the prosecutor improperly elicited prejudicial and inadmissible testimony about [his] arrest." (Appellant's brief, p. 59.) During the prosecution's examination of Gary Walker, a detective with the Decatur Police Department, the prosecutor questioned Walker about how the appellant was arrested. Walker testified that the appellant was arrested on a bridge as he was returning from taking his children to school. He concluded his explanation with the statement, "There was a State Trooper helicopter above in case something happened, he could keep track of the vehicle in case Mr. Drinkard ran." (R.2097.) The appellant objected to this comment and moved to strike it. The trial court sustained the appellant's objection and instructed the jury to "disregard any comment about what the defendant might do or might have done." (R.2098.) "The appellant's objection to the statement was sustained, and his motion for a curative instruction was granted. Therefore, there is no adverse ruling which this court can review." Ross v. State, 555 So.2d 1179, 1182 (Ala.Cr.App.1989).

*274 G.
Last, the appellant claims that "[t]he cumulative effect of the prosecutorial misconduct violated" his rights. (Appellant's brief, p. 60.) There is no merit to this assertion. "`Because no single instance of alleged improper conduct constituted reversible error, this Court will not consider the cumulative effect to be greater error. McNeely v. State, 524 So.2d 375 (Ala.Cr.App.1986); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App.1989).' Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App. 1993), aff'd, 630 So.2d 125 (Ala.1993)." Boyd v. State, 715 So.2d 825, 851 (Ala.Cr. App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

XII.
The appellant claims that the trial court committed numerous evidentiary errors. He appears to concede that none of the alleged errors constitutes reversible error; however, he argues that the cumulative effect of these alleged errors warrants reversal of his conviction.

A.
First, in a somewhat confusing argument, the appellant alleges that "the trial court erred by admitting testimony based on an unduly suggestive photographic lineup." (Appellant's brief, p. 61.) Specifically, he contends that Earthy Smith, the victim's neighbor, was erroneously allowed to testify that photographs of the appellant's automobile resembled the vehicle that he saw leaving the victim's home on the night of the crime. The appellant argues that Smith's recollection of the vehicle that he saw leaving the scene of the crime was based on a photographic lineup that, he claims, was unduly suggestive because that lineup included only pictures of the appellant's vehicle.
Earthy Smith testified that the on the night of the crime, he saw a "'76 up to a '78 or so Ford LTD" automobile (R. 1778) leaving the victim's house. He testified that he was familiar with that type of vehicle because he was a mechanic. He thought that the vehicle was a medium blue color. The following occurred:
"Q [prosecutor]: All right. Let me show you some pictures I've marked State's Exhibit 53, 54, and 55, have you look at those pictures.
"A: That'sthat's the body style and the year make.

"Q: Okay.
"A: It's not quite the color I saw.
"Q: All right. This is akind of a I'd call it, I guess a green-looking color here?
"A: Yeah. A teal green or something.
"Q: Okay. What kind of light were you looking at the car under as it was driving by?
"A: It was kind of a bluish light out there on the street there. A green looking or whatever."
(R. 1781.) (Emphasis added.)
During defense counsel's cross-examination of Sheila Moore, an investigator with the Decatur Police Department, the following transpired:
"Q [defense counsel]: During the second visit [with Mr. Earthy Smith], you showed Mr. Smith a series of photos of another vehicle; did you not?
"A: I believe it was that visit with him, yes, sir.
"Q: Okay. Were those photos pictures of Gary Drinkard's car?
"A: Yes, sir, it was.
"Q: Were there any other cars included in this series of photos that you showed him?
"A: No, sir.
"Q: So it was just a one-car lineup; is that correct?
"A: Yes, sir.
"Q: And did Mr. Smith at that time tell you that it looked like the body style of the car, but it wouldn'tthe color *275 didn't quite match; do you recall him telling you that?
"A: No, sir.
"Q: Well, what did he say?
"A: He said that that was the body style, but he was unsure of the color because of the lighting. It was under a street light."
(R. 2330-31.)
The trial court did not err in allowing Smith to testify to the type of car that he saw leaving the victim's home on the night of the crime. As evidenced from the above excerpt, Smith's description of the vehicle was based upon his independent recollection of the vehicle, not on the photographs of the appellant's car he was shown. Ex parte Windsor, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). Furthermore, Smith did not testify that the automobile in the photographs was the same automobile that he saw leaving the victim's homehe simply indicated that it was the same make and body style.

B.
The appellant maintains that the trial court erred by prohibiting defense counsel from questioning Officer Sheila Moore about whether the appellant was thrown to the ground during his arrest. He argues that this information was critical to his defense because it would have shown that a scratch on his arm could have occurred during his arrest, rather than during a struggle with the victim, as the prosecution contended.
The trial court prohibited the appellant's counsel from eliciting this information from Officer Moore because, the trial court found, it was cumulative to another witness's testimony. "It is within the trial court's discretion to exclude cumulative evidence." Williams v. State, 710 So.2d 1276, 1327 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). We find no abuse of discretion in the trial court's ruling.

C.
The appellant also claims that the trial court erred by preventing defense counsel "from cross-examining a state witness about the witness's criminal activity." (Appellant's brief, p. 63.) Specifically, he alleges that he was erroneously precluded from establishing that Rex Segars was involved in a criminal relationship with a Paul Tapscott. He argues that "[b]ecause Mr. Tapscott was involved in criminal activity with two of the state's key witnesses, it was important to [the appellant] to establish the extent of Mr. Segar's criminal relationship with Mr. Tapscott." (Appellant's brief, p. 63.) There is no merit to this assertion.
Rex Segars was the common-law husband of the appellant's half-sister, Beverly Robinson. Segars, a convicted felon, testified on direct examination that in return for his testimony, the state had agreed to dismiss a number of charges against him, including an unlawful-possession-of-a-fire-arm charge. (R. 2186-88.)
On cross-examination, Segars testified that the unlawful firearm he was charged with possessing actually belonged to Beverly Robinson, and that she had obtained it from a Paul Tapscott. (R. 2255.) Later, in the defense's cross-examination, the following occurred:
"Q: Who was the friend [who] picked you up and carried you to the Windwood Motel?
"A: Paul Tapscott.
"Q: Is that Paul Wayne Tapscott?
"A: Yes, sir. He signed my bond.
"Q: Is that the guy you got and pawned this .22 from?
"A: Sir?
"Q: Is this the guy you pawned the.22 with?
"A: Pawned the .22 with?

*276 "Q: Yeah, or did you buy the .22 from him?
"A: No, sir.
"Q: Who did?
"A: I think Beverly borrowed the pistol.
"Q: Beverly borrowed ... the pistol from Mr. Tapscott.
"A: Yes, sir.
"Q: Is he in the business of loaning guns?
"A: No, sir.
"Q: He did this as a special favor to you and Beverly?
"A: No, sir. He justhe was over there one day and he had that old gun and I think the way Beverly told me, he just had that old gun and he said
"Q: I'm not asking you what she said or he said.
"A: Well, that would be hearsay. Anything I'd answer would be hearsay then, because I wasn't there when she got it.
"Q: You weren't there when she got it?
"A: No, sir.
"Q: Okay. Now have you ever taken any stolen goods from Mr. Tapscott and had him fence them for you?

"A: No, sir.

"MR. MATTHEWS [prosecutor]: Your Honor, I'm going to object to any questions about any of these kind of acts. He's not been convicted of any of these offenses and obviously it doesn't have anything to do with this case.

"THE COURT: Sustained."
(R. 2259-61.)(Emphasis added.)
We find no abuse of discretion in the trial court's ruling. Segars responded that he was not involved in the illegal activity suggested by defense counsel. Furthermore, the appellant was allowed to test the witness's credibility by questioning him about his prior convictions and the agreement that he had entered into with the state.

D.
The appellant next argues that the trial court "committed another evidentiary error by not admitting a state witness's written statement." (Appellant's brief, p. 63.) He alleges that the trial court should have allowed him to introduce the written statement Michael Alexander gave to the Decatur police because, he argues, it was inconsistent with Alexander's trial testimony.
On direct examination, Michael Alexander, a friend of the victim's, testified that on the evening of the murder, he drove by the victim's house and saw the victim and another man sitting on the victim's front porch. He also testified that he saw a "Ford Thunderbird or an LTD" automobile parked in the yard. (R.1906.)
On cross-examination, defense counsel questioned Alexander about the written statement that he gave to the police in August 1993. Defense counsel elicited that Alexander did not mention in his statement to the police that the vehicle that he saw on the evening of the murder could have been an LTD.
When defense counsel attempted to introduce the written statement that Alexander gave to the police, the prosecution objected. The trial court sustained the state's objection to the admission of the written statement. The trial court found that the defense had been allowed to question the witness about the written statement on cross-examination; therefore, it disallowed admission of the written statement. The trial court's ruling does not constitute reversible error.

E.
The appellant claims that the "trial court also erred in refusing to allow defense counsel to ask a defense witness on redirect why she had not gone to the police earlier." (Appellant's brief, p. 64.) *277 On direct examination, Kelly Harville, the appellant's adopted daughter, testified that she and the appellant were at home on the night of the murder. On cross-examination, the prosecution elicited that Harville had told this alibi to no one, except the appellant's attorneys. On redirect examination, defense counsel attempted to question Harville about the specifics of the conversation she had with defense counsel. The trial court ruled that such testimony was inadmissible because it might violate the attorney-client privilege. We find no abuse of discretion in the trial court's ruling. "The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Comment to Rule 1.6, Rules of Professional Conduct.

F.
At the conclusion of his argument, the appellant mentions a number of other allegedly erroneous rulings by the trial court. He cites no specific legal authority in support of his assertions, and he presents little, if any, argument to support his claims. As we have noted, "this practice `smacks of "sandbagging,"'" which has been condemned by the United States Supreme Court. Burgess v. State, 723 So.2d 742, 761 (Ala.Cr.App.1997). However, because this is a capital murder case, we have reviewed the rulings for plain error, and find none.
He also suggests that "the aggregation of these errors denied [him] the right to a fair trial." (Appellant's brief, p. 65) There is no merit to this assertion. As we stated in part XI of this opinion, "`[b]ecause no single instance of alleged improper conduct constituted reversible error, this Court will not consider the cumulative effect to be greater error. McNeely v. State, 524 So.2d 375 (Ala.Cr.App.1986); Johnson v. State, 541 So.2d 1112 (Ala.Cr. App.1989).' Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App.1993), aff'd, 630 So.2d 125 (Ala.1993)." Boyd v. State, 715 So.2d at 851.

XIII.
The appellant maintains that "[t]he court improperly admitted photographs that served only to inflame the jury." (Appellant's brief, p. 65.) Although it is not abundantly clear from his argument, he appears to suggest that the trial court improperly admitted into evidence the autopsy photographs.[6]
An argument can be made that the appellant did not adequately object to the admission of the photographs; nevertheless, this court must still review the photographs to determine if their admission into evidence constitutes plain error. Rule 45A, Ala.R.App.P. After reviewing the photographs, we find no error, plain or otherwise, in the admission into evidence of the photographs. The photographs served to illustrate the testimony of Dr. Joseph Embry, the forensic pathologist who performed the autopsy on the victim. Smith v. State, 756 So.2d 892 (Ala.Cr.App. 1997).

XIV.
The appellant maintains that the trial court's failure to question potential jurors about their bias in favor of the death penalty violated his rights to an impartial jury and a fair trial. The appellant did not object on this basis during trial; therefore, this issue must be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
"`The failure of the trial court to propound sua sponte "reverse-Witherspoon" questions to the jury venire and the failure of the court to "life-qualify" the jury does not constitute *278 plain error. Henderson v. State, 583 So.2d 276, 283-84 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "The burden of either asking or having the trial judge ask a `reverse-Witherspoon' question lies with the appellant." Smith v. State, 581 So.2d 497, 506 (Ala.Cr.App.1990), reversed on other grounds, 581 So.2d 531 (Ala. 1991). Here, as in Smith, 581 So.2d at 506, "we have reviewed the appellant's claim, and we find no `plain error' by the trial judge's failure to ask sua sponte a `reverse-Witherspoon' question."'
"Taylor, 666 So.2d 36 at 40 (footnote omitted). See also Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, Haney v. Alabama, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Dill v. State, 600 So.2d 343, 363 (Ala.Cr. App.1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474, 484-85 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, Kuenzel v. Alabama, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)."
Ivery v. State, 686 So.2d 495, 514 (Ala.Cr. App.1996). See also, Arthur v. State, 711 So.2d at 1082.
Accordingly, we find no plain error in the trial court's failure to sua sponte question the potential jurors about their bias in favor of the death penalty. We note that the appellant's counsel did question each of the five jury panels about any biases in favor of the death penalty the members of the panel may have had.

XV.
The appellant contends that the "trial court improperly admitted an incomplete version of a statement covertly obtained from [him]." (Appellant's brief, p. 68.) Specifically, he maintains that the state improperly elicited testimony as to only part of the conversation between the appellant and his half-sister, Beverly Robinson, in which he allegedly implicates himself. He alleges that the state should have introduced the entire conversation.
As discussed in Part VIII of this opinion, Beverly Robinson contacted the sheriff's department and turned the appellant in for the murder of Dalton Pace. She subsequently agreed to wear a concealed microphone and to engage in a conversation with the appellant. During the prosecution's direct examination of Robinson, the following occurred:
"Q: After the police began investigating this case, did the defendant in this case have another conversation with you sometime after that?
"A: Yes, sir.
". . . .
"Q: Tell us first where you were and about what time of day it was and who all was present.
"A: It was early in the morning, and I had went over to their house and
"Q: Do you know what day it was?
"A: Not exactly.
"Q: Would it have been after you got arrested or
"A: Yes, sir. It was after that.
"Q: What happened then?
"A: I had went over to their house. Him and his wife and his children were there. It was before school started. It was early in the morning.
". . . .
"Q: Early in the morning, okay. Can you tell us as close as you can remember what he said about this case, how it came up and what was said.
"A: Well, there was a lot of things said, but the only thing pertaining to the case that he actually said, Iwe were there was an article in the newspaper about Mr. Pace. And I asked him, I said, `Well, did you know this guy?' And he said, `Yeah, he was a pretty good guy.' *279 He said, `I bought some parts from him and he was a pretty good guy.' And then his voice got loud and he said, `He was a big fucker.' He said, `I realized that when he grabbed my arm and ripped my sleeve.'
"Q: Did he say anything
"A: And then heheI guess he realized what he'd said and he did not say another word, nothing. Nothing.
"Q: Did he ever say anything to you after that?
"A: No, sir. That was it, that I can remember. That was all."
(R.2037-39.)
Gary Walker, a detective with the Decatur Police Department, investigated the murder of Dalton Pace. He testified that Robinson had agreed to wear a concealed recording device while she spoke with the appellant. The conversation was monitored by Walker and a couple of other investigators. During the prosecution's direct examination of Walker, the following occurred:
"Q: Did you see when Ms. Robinson got out of the car, what she did?
"A: No, sir. I was not in a position to see her when she got out of the car.
"Q: But you saw her drive her car to Mr. Drinkard's?
"A: Yes, sir.
"Q: Would you tell then what you heard after that....
"A: The taping system apparently was bad and we didn't realize it. As I said, there was a lot of static, a lot of background noise. You could hear some words that were said. There was one particular part that's about 14 minutes 14 minutes and 40 some-odd seconds into the tape
". . . .
"A: As I said earlier, a little more than 14 minutes into the conversation, I heard Mr. Drinkard say, `The old man grabbed at me.' A truck at that point went by, a truck or a vehicle, I missed the next little bit, second or so of what he said, and then he picked back up, `and then we went for a gun or something.'
"Q: Did you say a gun or something or are you quoting his words, `and then he went for a gun or something'?
"A: No, I'm saying I quoted his words what he said."
(R.2091-93.)
Walker testified that approximately 17 minutes into Robinson's conversation with the appellant, the recording device failed. A few minutes later, Robinson left the appellant's house and went to where the investigators were waiting. The investigators retrieved the recording device from Robinson. Robinson then accompanied the investigators to the police department, and she gave them a statement about her conversation with the appellant.
As noted above, the appellant contends that the prosecution improperly elicited testimony as to only the portion of his statement to Robinson in which he allegedly implicated himself. He alleges that the state should have elicited testimony regarding the entire conversation between the appellant and Robinson. The appellant did not object on this basis below.[7]
"`If a part of a conversation is adduced in evidence by the state as proving the defendant's declarations or confessions of guilt, the defendant has the right to call for the whole of what was said in that conversation *280 relative to the subject matter of the issue. Chamber[Chambers] v. State, 26 Ala. 59 (1855); William v. State, 39 Ala. 532 (1865); Mullis v. State, 258 Ala. 309, 62 So.2d 451 (1953). The accused is entitled, on cross-examination, to bring out all that he said, at the same time and on the same subject. Parke v. State, 48 Ala. 266 (1872).
"`However, the rule which frowns upon incomplete confessions is designed to cover cases where an accused, after admitting commission of the criminal act, is prevented from going further and saying anything which might explain or justify his act. William, supra; United States v. Wenzel, 311 F.2d 164 (2d[4th] Cir. 1962); see generally 29 Am.Jur.2d 586, Evidence, § 535.'
"King v. State, 355 So.2d 1148, 1151 (Ala.Cr.App.1978). See also Ashford v. State, 472 So.2d 717, 720 (Ala.Cr.App. 1985).
". . . .
"`A confession should be considered in its entirety. If the state introduced into evidence only a portion of an alleged confession, a defendant is entitled to introduce the remainder of what was said to and by him, including any exculpatory statements which would bear upon the matter in controversy.'
"King v. State, supra, at 1151."
Bridges v. State, 516 So.2d 895, 898-99 (Ala.Cr.App.1987).
We find no plain error in the prosecution's decision to present evidence of only that portion of the conversation between the appellant and Robinson wherein he implicates himself. Robinson testified that nothing more was said in the conversation that pertained to the murder. More importantly, nothing prevented the appellant from questioning Robinson or Walker on cross-examination about the entire conversation.
The appellant also claims that his statement to Robinson was inadmissible because, he argues, the state failed to prove that the statement was voluntary, and because he was not apprised of his rights prior to the statement. There is no merit to either assertion.
While Beverly Robinson did engage in the conversation with the appellant at the suggestion of the police, "there is absolutely no indication that the appellant was aware of this, or that he confessed falsely because of this." Hagood v. State, 777 So.2d 162, 210 (Ala.Cr.App.1998). The evidence supports the conclusion that the appellant's statement during his conversation with Robinson was voluntary.
Furthermore, the fact that the appellant was not apprised of his Miranda[8] rights does not render the statements inadmissible.
"`Miranda warnings are required only when a suspect is in custody and is subjected to interrogation by a law enforcement officer. Miranda [v. Arizona], 384 U.S. [436] at 477-78, 86 S.Ct. 1602, 16 L.Ed.2d 694; Cure v. State, 600 So.2d 415 (Ala.Cr.App.), cert. denied, 600 So.2d 421 (Ala.1992); Perkins v. State, 574 So.2d 988 (Ala. Cr.App.1990); Molina v. State, 533 So.2d 701 (Ala.Cr.App.1988). The coercion against which Miranda was designed to protect can occur only through the interaction of these two elements. Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).'
"Campbell, [Ms. CR-94-2290, August 22, 1997] 718 So.2d at 135. [(Ala.Cr.App. 1997)]. See also, Clay v. State, 687 So.2d 1245 (Ala.Cr.App.1996); Bates, [549 So.2d 601 (Ala.Cr.App. 1989)]." *281 Hagood, 777 So.2d at 210-11. The appellant was clearly not in custody when he engaged in the conversation with Robinson.

XVI.
The appellant contends that the trial court's instruction on reasonable doubt violated the principles of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The trial court charged the jury, in pertinent part as follows:
"Proof beyond a reasonable doubt does not require absolute proof or proof beyond all doubt or proof to a mathematical certainty. A reasonable doubt which would justify an acquittal of the defendant must be an actual doubt, not a mere guess or supposition. A reasonable doubt must not be vague, conjectural or speculative doubt. It must be a doubt based upon reason and common sense which remains in your minds after a careful consideration of all the evidence. A reasonable doubt may arise from a lack of evidence, a conflict in evidence, a contradiction in the testimony of witnesses, or any combination of those factors. A reasonable doubt is not a mere possible doubt, because everything that occurs and requires us to make decisions in our daily lives is open to some imaginary or possible doubt. Proof beyond a reasonable doubt must, therefore, be proof of such a character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her everyday affairs."
(R. 2746-47.) The appellant argues that the portion of the court's charge wherein the court stated that "`proof of such character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her everyday affairs,'" coupled with "the other parts of the instruction, lowered the burden or proof because it guide[d] the jurors' understanding about the state's burden in terms of their own personal affairs." (Appellant's brief, p. 75.) The appellant did not object to the court's charge; therefore, we must review the charge for plain error.
After reviewing the court's instructions, we conclude that it does not violate the principles set forth in Cage. As we have stated:
"Although the trial court did refer to a reasonable doubt as an `actual doubt,' it did not state that the doubt must be `grave' or `substantial,' as the faulty charge in Cage instructed. See Cage, 498 U.S. at 40, 111 S.Ct. at 328 (holding that the terms `grave' and `substantial' suggest a higher degree of doubt than that actually required to acquit). Furthermore, the trial court's instruction that the doubt could not be `fanciful,' `vague,' `speculative,' `arbitrary,' or `merely possible' follows the language of the Alabama Pattern Jury Instruction: Criminal on a reasonable doubt charge. The fact that the trial court followed an accepted pattern jury instruction weighs heavily against any finding of error. Carroll v. State, 599 So.2d 1253 (Ala.Cr. App.1992), aff'd, 627 So.2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); Dill v. State, 600 So.2d 343 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)."
Smith v. State, 756 So.2d 892, 922 (Ala.Cr. App.1997).
Furthermore, the fact that the trial court explained the state's burden of proof in terms that were more personal to the jurors did not lower the burden of proof. In Ex parte Trawick, 698 So.2d 162, 173 (Ala.1997), the trial court charged the jury in relevant part:
"`I am going to suggest to you that proof beyond a reasonable doubt would be proof of such a convincing character that you would be willing to rely and act *282 upon it without hesitation in the most important of your own personal affairs.'"
Contrary to the defendant's assertion in Trawick that the charge lowered the burden of proof because it allegedly "`guide[d] the jurors' understanding about the state's burden in terms of their own personal affairs,'" the Court found that the statement "effectively highlighted the high degree of proof that was necessary to prove Trawick's guilt, by describing it in a way that made it more personal for the jurors." 698 So.2d at 173.
Accordingly, we find no plain error in the trial court's charge on reasonable doubt.

XVII.
The appellant claims that the trial court erred in denying his motion for a judgment of acquittal because, he says, the state failed to present sufficient evidence to support a finding that he intentionally murdered the victim during a robbery in the first degree. See § 13A-5-40(a)(2), Code of Alabama 1975. Specifically, he argues that the state failed to carry its burden of proof because, he maintains, "[t]here was no testimony from any witness that anyone saw [him] at the crime scene, [t]here was no forensic evidence that linked [him] to the scene, and the police did not find evidence that previously belonged to the victim in [his] possession." (Appellant's brief, p. 76.)
When viewing the evidence in the light most favorable to the state, (see White v. State, 546 So.2d 1014, 1016-18 (Ala.Cr. App.1989), for a thorough discussion of the applicable standard of appellate review), we find, that the state established that the appellant murdered the victim during a robbery in the first degree. The fact that much of the evidence linking the appellant to the crime was circumstantial does not render the state's evidence insufficient. See, White, supra. Accordingly, the trial court did not err in denying the appellant's motion for a judgment of acquittal.

XVIII.
Acknowledging that the law is contrary to his position, the appellant nevertheless claims that the trial court erred in not considering, as a mitigating circumstance, residual doubt. There is no merit to this claim.
"`Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some states have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilt phase of the trial, see Lockhart v. McCree, 476 U.S. 162, 181, 106 S.Ct. 1758, 1768, 90 L.Ed.2d 137 (1986), but we have never indicated that the Eighth Amendment requires states to adopt such procedures. To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of "residual doubts" about guilt. See Ante, [487 U.S. at 173 n. 6, 108 S.Ct.] at 2327, n. 6.
"`Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. [citations omitted]. "Residual doubt" is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty."'"
Harris v. State, 632 So.2d 503, 535 (Ala.Cr. App.1992), aff'd, 632 So.2d 543 (Ala.1993), *283 aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (Ala.1995), quoting Franklin v. Lynaugh, 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). See also Myers v. State, 699 So.2d 1281 (Ala.Cr. App.1996), aff'd, 699 So.2d 1285 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998).
Even so, the trial court stated in its sentencing order that even if residual doubt was considered as a mitigating circumstance "the court finds by a preponderance of the evidence that this circumstance does not exist in this case." (C.R.71.)

XIX.
The appellant alleges that the trial court erred in failing to conduct individually sequestered voir dire. Because the appellant did not request that the trial court conduct individually sequestered voir dire, we must review the appellant's claim for plain error.
"`"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala. 1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard.
"`Ex parte Land, 678 So.2d at 242 [(Ala. 1996)].'
"`In Haney [v. State, 603 So.2d 368 (Ala.Cr.App.1991)], this court addressed a claim similar to the one raised by the appellant as follows:
"`"`Appellant contends that the trial court erred in failing to grant individually sequestered voir dire of the jury venire. The trial court did permit individual voir dire in several instances but otherwise the jurors were questioned by panels. As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala.Cr.App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1988)[(1985)]. This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir.1984). We have reviewed the record of the voir dire examinations and the entire jury selection procedure in this case and find that the method of empaneling the jury provided reasonable assurance that prejudice would have been discovered if present. We find no abuse of discretion in the trial court's handling of the empaneling of this jury.'
"`603 So.2d at 402.
"`"Even in capital cases, there is no requirement that a defendant be allowed to question each perspective juror individually during voir dire examination." Hallford v. State, 548 So.2d 526, 538 (Ala.Cr.App.), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). See also Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, on remand, 666 So.2d 71 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala.1995).'
"Stewart v. State, 730 So.2d 1203, 1243 (Ala.Cr.App.1997)."
Hyde v. State, 778 So.2d 199, 232-33 (Ala. Cr.App.1998). See also, Smith v. State, 727 So.2d 147 (Ala.Cr.App.1998), quoting Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992) ("[w]e *284 have already held that questioning a venire in panels meets the requirements of due process and provides `reasonable assurance that any prejudice on the part of the jurors would be exposed'").
The record reflects that the trial court separated the venire into five panels. The attorneys then questioned each panel. The attorneys were permitted to ask extensive questions of each panel and, in addition, the attorneys were permitted to question veniremembers individually regarding their answers to questions propounded during voir dire of the panels. After a thorough review of the record of the voir dire proceedings, we are convinced that "[t]his method of empaneling and questioning the jury reasonably assured that prejudice, if present, would have been discovered." Hyde, 778 So.2d at 233. Accordingly, we find no plain error in the trial court's failure to order, sua sponte, individually sequestered voir dire.

XX.
The record reflects that after the jury convicted him, the appellant waived his right to a sentencing hearing before a jury. The state consented to the waiver, provided that the appellant was fully apprised of his rights on the record, and the appellant evidenced an intent to waive those rights on the record. The appellant also requested to serve as cocounsel at his sentencing hearing before the trial court, and he insisted that no mitigating evidence be presented at the sentencing hearing. Now he claims that the trial court erred in granting his requests.
Section 13A-5-44(c), Code of Alabama 1975, provides:
"Notwithstanding any other provision of law, the defendant with the consent of the state and with the approval of the court may waive the participation of a jury in the sentence hearing provided in Section 13A-5-46. Provided, however, before any such waiver is valid, it must affirmatively appear in the record that the defendant himself has freely waived his right to the participation of a jury in the sentence proceeding, after having been expressly informed of such right."
(Emphasis added.)
Section 13A-5-46(a) reads:
"Unless both parties with the consent of the court waive the right to have the sentence hearing conducted before a jury as provided in Section 13A-5-44(c), it shall be conducted before a jury which shall return an advisory verdict as provided by subsection (e) of this section. If both parties with the consent of the court waive the right to have the hearing conducted before a jury, the trial judge shall proceed to determine sentence without an advisory verdict from a jury. Otherwise, the hearing shall be conducted before a jury as provided in the remaining subsections of this section."
(Emphasis added.)
The trial court engaged in a lengthy colloquy with the appellant, during which the court thoroughly explained his rights. The trial court cautioned the appellant that it would be in his best interest not to waive the sentencing hearing. The trial court inquired whether the appellant understood his rights and whether he was voluntarily waiving those rights. The appellant indicated that he was. The trial court explained that the state intended to prove two aggravating circumstances, and that one of the aggravating circumstances that the capital offense was committed while the appellant was engaged in the commission of, or an attempt to commit, or a flight after committing, a robberywas already established by the jury's guilty verdict. The appellant indicated that he understood this. After much discussion, the trial court determined that the appellant had knowingly and voluntarily waived his right to a sentencing hearing before a jury.
We find no plain error in the trial court's allowing the appellant to waive the *285 sentencing hearing before the jury. The record supports the conclusion that the appellant "freely waived his right to the participation of a jury in the sentence proceeding, after having been expressly informed of such right."
On September 22, 1995, the trial court conducted a sentencing hearing. Toward the beginning of the hearing, defense counsel informed the trial court that the appellant wanted to serve as co-counsel at the hearing for the purpose of giving a statement to the court. The trial court did not rule on the appellant's request until after the state had presented its evidence. The following then occurred:
"MR. DIGIULIAN: Judge, Mr. Drinkard renews his motion to act as cocounsel. We've reviewed his statement. It appears to be appropriate. It appears to be a statement that he would be entitled to make, and we request that he be allowed to do that.
"THE COURT: Is that solely for the purpose of making the statement?
"MR. DIGIULIAN: Yes, sir. And we also want to put a few things on the record after he makes his statement, of a procedural nature.
"THE COURT: MR. Drinkard, I want you to listen to what I say before I make a decision in this. First of all, I think you're aware, because I think you've been involved in making decisions with your counsel in the other phases of this trial, that these are complicated procedures. And particularly the sentencing phase is complicated because of the way the statute is written and the facts that have to be considered. And I would want you to know that it is quite possible that, in making a statement for yourself, you may say something, even though you've conferred with your counsel prior to making that statement, that you could possibly say something that would not be in your best interest and not be aware that that even is occurring. And of course whatever you tell me, I can consider in my ultimate sentencing decision, whether it's good, bad or indifferent, however you may state it. Your attorneys are very, very well equipped to make the decisions and recommendations about what should and should not be presented in your behalf. If I allow you to act as co-counsel, I recommend that you still confer with them and consult with them in any decision you make where you, yourself, intend to participate during the course of this proceeding. Do you understand all that?
"THE DEFENDANT: Yes, sir.
"THE COURT: Any questions about it?
"THE DEFENDANT: No, sir.
"THE COURT: All right, I will grant your motion then and allow you to serve as co-counsel for purposes of this sentencing hearing and for purposes of presenting a statement to the Court at the appropriate time. All right. Besides his proposed statement, is therebefore we get to that point, is there any other evidence or anything to be offered on his behalf at this point?
"MR. DIGIULIAN: Judge, we want to put on the recordI was going to do it after he made his statementbut we want to put on the record Mr. Drinkard's expressed desire to each one of us that he has instructed us that we are not to put on any evidence of mitigation. We want to get that clearly in the record. I think that's an appropriate step at this point. We had wanted to wait until after he made his statement, but if the Court wants us to do that now, we can certainly do that now.
"THE COURT: All right, Mr. Drinkard, I want you to come out and I want you to sit in this chair right out here. I've got some questions I'm going to need to ask you in light of what your attorney just told me. We went into this a little bit at the end of the guilt phase of the trial, but I'm going to have to ask you certain questions that I asked you at that time, because apparently *286 you're asking for the right to waive or give up the presentation of a sentencing defense, or what we would call evidence to mitigate. And I've got to assure that if you do that, because the way the statute is written, that you know exactly what you're doing and you're doing it voluntarily."
(R. 2853-56.)
The trial court then ascertained that the appellant was 40 years old and that he had no history of mental illness. In response to questions from the trial court, the appellant indicated that although he had taken prescription drugs for back and nerve problems within 24 hours of the hearing, he was not under the influence of any medication at the time of the hearing. The appellant assured the trial court that he was fully capable of making rational decisions, and that he was capable of making lucid statements to the court.
The following then occurred:
"THE COURT: Mr. Drinkard, before today, have you discussed with your attorneys your right under the law to present a sentencing defense in this case? That is, your right to contest the State's case and their request that you be capitally punished and your right to present mitigating evidence in your behalf?
"THE DEFENDANT: Yes, sir. Several times.
"THE COURT: Tell me why it is that you've elected not to present any mitigating evidence for purposes of a sentencing defense?
"THE DEFENDANT: Well, the law states that a man's innocent until proven guilty. I don't think they've proven any guilt. I'm not guilty, so therefore I don't think I should have to offer anything else.
"THE COURT: You understand that the sentencing alternatives that are presented to me are to sentence you to life imprisonment without parole or to death by electrocution; do you understand that?
"THE DEFENDANT: Yes, sir.
"THE COURT: You understand that in determining which of those two sentences I impose, that I'm required to weigh or balance the statutory aggravating circumstances that you've heard the State discuss against any mitigating circumstances; you understand that process?
"THE DEFENDANT: Yes, sir. I understand it fully.
"THE COURT: You understand that the mitigating circumstances are those circumstances or facts which would tend to indicate that a sentence of life imprisonment without parole should be imposed?
"THE DEFENDANT: Yes, sir. I'm 40 years old. Either way if by some odd chance that I did not get a new trial and was not found not guilty then, I don't want to set down there the rest of my life.
"THE COURT: Have you provided your attorneys with any particular mitigating evidence that you know of?
"THE DEFENDANT: No, sir.
"THE COURT: Mr. DiGiulian, I'm going to ask this of you since you basically have spoken on behalf of the defense team. Is it my understanding from you that since the jury's verdict in this case that Mr. Drinkard has either refused or failed to cooperate in developing mitigating evidence?
"MR. DIGIULIAN: Judge, part of that I cannot answer, because it would go to attorney-client
"THE COURT: Well, I'm not asking you to do that. I'm basically trying to find out, you know, whether or not in your opinion, this is a rational decision on his part and a decision that y'all consider to be in his best interest.
"MR. DIGIULIAN: I think it's a rational decision on Mr. Drinkard's part. I do not think it's in his best interest. I *287 don't think not presenting evidence is ever in anyone's best interest.
"THE COURT: Have you communicated that fact or that judgment call to him?
"MR. DIGIULIAN: Judge, I can't because of attorney-client privilege, I can't specifically answer that question. Let me say this, we haveMr. Drinkard has had several conversations with me, individually, and with Mr. Mason, and both of us together. And I don't think, based on those conversations, that Mr. Drinkard has made this decision I'm not saying I agree with it, but I don't think he made it irrationally, let me put it that way. I think he understands what he's doing. That is the best I can tell you.
"THE COURT: After having been fully advised of what's involved in this type proceeding and so forth?
"MR. DIGIULIAN: Yes, sir."
(R. 2860-64).
The trial court explained the two aggravating circumstances that the state claimed were present, and it explained the statutory mitigating circumstances that it was required to consider. The appellant indicated that he understood what the court had explained, and that he did not have any questions. The court cautioned the appellant that it would be in his best interest to allow his attorneys to present a sentencing defense. Despite the trial court's admonition, the appellant indicated that he did not want his attorneys to offer any mitigating evidence.
In its written sentencing order, the trial court found:
"The defendant voluntarily, knowingly and intelligently waived his right to present evidence of mitigating circumstances during the September 22, 1995, sentence hearing before the Court. Irrespective of this waiver, the Court has thoroughly considered all statutory, as well as any non-statutory, mitigating circumstances which might reasonably apply in this case."
(C.R.67-68.) The trial court found no statutory mitigating circumstances. The trial court did find the existence of one nonstatutory mitigating circumstance:
"The defendant has offered no testimony or other evidence about his character. The Court notes from the testimony at trial that, at the time of the crime, the defendant was married to Vicki Drinkard and had an adopted daughter, Kelly Drinkard Harville, who is now married. The fact that the defendant is apparently married, has an adopted daughter and perhaps other children is considered by the Court as a mitigating circumstance. However, this circumstance is entitled to very little weight in determining the appropriate punishment to impose in this case."
(C.R.71.)
We find no plain error in the trial court's decision to allow the appellant to act as cocounsel at his sentencing hearing.
"The Sixth Amendment to the United States Constitution provides in pertinent part:
"`In all criminal prosecutions, the accused shall enjoy the right to ... be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.'
"(Emphasis added [in Arthur].) The Supreme Court of the United States has interpreted these words to afford a criminal defendant the right to be represented by an attorney, see Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and the right to represent himself without the assistance of counsel, see Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). `Because these rights are basic to our adversary system of criminal justice, they are part of the "due process of law" that is guaranteed by the Fourteenth *288 Amendment to defendants in the criminal courts of the States.' Faretta, 422 U.S. at 818 and n. 14, 95 S.Ct. 2525.
"On the one hand, the Constitution guarantees an accused the right to assistance of counsel in his defense. On the other hand, it guarantees him the right to abandon the assistance of counsel and to present his own defense. Such an abandonment must be accompanied by a showing in the record that the accused made a knowing and intelligent decision to forgo counsel. Faretta, 422 U.S. at 835, 95 S.Ct. 2525....
"... Faretta, 422 U.S. at 835-36, 95 S.Ct. 2525, requires the following:
"`The record [must] affirmatively show[ ] that [the accused] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will.... For [this purpose, the accused's] technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself.'
"(Emphasis added [in Arthur].) See Fitzpatrick v. Wainwright, 800 F.2d 1057, 1065 (11th Cir.1986) (`The ultimate test is not the trial court's express advice, but rather the defendant's understanding.')."
Ex parte Arthur, 711 So.2d 1097, 1099 (Ala.1997).
The record reflects that the appellant was "literate, competent, and understanding, and that he was voluntarily exercising his informed free will" when he insisted on acting as co-counsel at the sentencing hearing before the trial court. Arthur, 711 So.2d at 1099, quoting Faretta, 422 U.S. at 835-36, 95 S.Ct. 2525.
In addition, we find no plain error in the trial court's allowing the appellant to waive the presentation of mitigating evidence at the sentencing hearing. "We hold that a competent defendant can waive the presentation of mitigating evidence at a capital sentencing proceeding, provided the trial court carefully weighs possible statutory and nonstatutory mitigating circumstances against the aggravating circumstances to assure that death is the appropriate sentence." Nelson v. State, 681 So.2d 252, 255 (Ala.Cr.App. 1995), on remand, 681 So.2d 257 (Ala.Cr. App.), aff'd, 681 So.2d 260 (Ala.1996). The record supports the conclusion that the appellant was competent to waive the presentation of mitigating evidence. Furthermore, the record reflects that in reaching the conclusion that death was the appropriate sentence, the trial court complied with § 13A-5-47, Code of Alabama 1975. The trial court carefully considered each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and, despite the appellant's insistence on not presenting any evidence in mitigation, the trial court nevertheless considered any relevant circumstances tending to mitigate the offense. See § 13A-5-52, Code of Alabama 1975.

XXI.
There is no merit to the appellant's contention that the trial court erred to reversal "by failing to consider whether [his] death sentence was unconstitutionally disproportionate to sentences imposed in other cases." (Appellant's brief, p. 83.) The appellant's assertion apparently stems from an incident that occurred at the sentencing hearing.
At the sentencing hearing before the trial court, the appellant made a statement claiming that he was innocent. At the conclusion of that statement, the appellant posed the following question to the trial court:
"And I would just like to know how a woman, clearly guilty of capital murder according to the law, can get three years and a man clearly not guilty be facing life without parole and the electric chair?"
(R. 2871.) He offered no evidence to support this vague assertion.
*289 In addressing the nonstatutory mitigating circumstances in its sentencing order, the trial court found, in relevant part:
"In his statement to the Court on September 22, 1995, the defendant contended that this Judge should have recused from trying the case; that no real evidence existed to convict him; that the Court should grant him a new trial; that the police lied during trial, failed to produce exculpatory evidence, planted evidence and unlawfully broke into certain premises; that he sat in jail two years for something he did not do; that he did not receive a fair trial; that he is not guilty of robbery, murder or capital murder; and that in view of the sentence the Court imposed in a separate non-capital murder case, he should not be considered for the death penalty. None of these contentions constitutes a mitigating circumstance; at best, they reflect the defendant's continuing denial of guilt and his reasons why he should be granted a new trial or his conviction overturned. They are not considered by this Court as mitigating circumstances in determining the appropriate sentence in this case."
(C.R.71-72.) (Emphasis added.)
As discussed in part XXVII of this opinion, the record reflects that in determining that death was the appropriate sentence, the trial court complied with § 13A-5-47, Code of Alabama 1975. The trial court carefully considered each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and, despite the appellant's insistence on not presenting any evidence in mitigation, the trial court nevertheless considered any relevant circumstances tending to mitigate the offense. See § 13A-5-52, Code of Alabama 1975. Accordingly, the fact that the trial court did not consider a sentence rendered in another noncapital case not involving the appellant as a mitigating circumstance does not constitute error.
The appellant's reliance on § 13A-5-53(b)(3), Code of Alabama 1975, is misplaced. That section requires that this Court, not the trial court, determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

XXII.
The appellant argues that the trial court erred in denying his motion to recuse the district attorney's office from prosecuting the case. Specifically, he claims that because Catherine Roberts, an attorney who was appointed to represent him, withdrew from representing him and began working at the district attorney's office, the entire district attorney's office should have been precluded from prosecuting the case against him. In support of his assertion, he maintains that "[t]o allow the Morgan County District Attorney's Office to prosecute this case inevitably encouraged the improper use of confidential information gained from [him] and his defense lawyers and severely undermined the public's confidence in the fairness of the prosecution." (Appellant's brief, p. 85-86.)
The trial court conducted hearings on the appellant's motion to recuse, during which Catherine Roberts, as well as every other member of the district attorney's office, testified. At the conclusion of the hearings, the trial court made the following findings:
"Well, here's the way I look at it. You know, there are basically two aspects of this that I am looking at, and of course, I'm concerned not about anything that Catherine Roberts hears that goes on in the district attorney's office. That's totally immaterial and irrelevant, whatever she may hear somebody else do. The only concern I have is whether or not she has made a disclosure of any information that she may have obtained in confidence while representing the defendant, and also the second thing is *290 preventing her, whether inadvertently or intentionally, from making such a disclosure or preventing the district attorney's office from trying to engage her in any kind of discussion or conference or anything else that might result in that.
"I'm satisfied by clear and convincing evidence at this point that to the point of this hearing today, that she has not made a disclosure to any member of the district attorney's staff of any information, be it verbal or written, that she obtained during her representation of the Defendant that would be considered confidential. So that finding I make, and that I believe is set in stone. I also would note that on July 7, pursuant to my order of July 6, she delivered to my office what she represented to be her entire file, which I still have in my possession and it's under seal, relating to her representation of Mr. Drinkard, so I have all of that material and I'm satisfied that again, based upon the evidence I have heard over two days of taking testimony, that none of those materials have been made accessible to or reviewed or inspected [by] the district attorney's staff, and I'm satisfied of that fact by clear and convincing evidence.
"Now, what that leaves me with in my judgment is simply, am I able to prevent any such disclosure from occurring? And I believe that I am able to do that, and that was what I intended to do by the first order I issued back on July 6, in which I placed certain restrictions not only on Ms. Roberts, but on every member of his staff separately and severally on the district attorney, I'm sorry, including Ms. Roberts. And I am going to keep all of those restrictions in effect, and no one will have access to the file and no one will have any conversation or allow Ms. Roberts to participate in any conversation concerning the prosecution of this case. And the last thing I would say is, based upon the law I have read, and I am satisfied that unless there has been a disclosure problem heretofore, then in my opinion, the other members of the district attorney's staff, other than Ms. Roberts, are not automatically disqualified from going ahead with the prosecution of this case.
"So for all of those reasons, and based upon my findings in this case, I am ordering that the defendant's motion to disqualify the district attorney's staff from prosecuting this case be denied, except to the extent that Ms. Roberts will not be allowed to participate in any manner, form or fashion in the prosection[prosecution] of this case."
(R. 261-64.)
The trial court's findings are supported by the record. Catherine Roberts testified she was appointed cocounsel for the appellant around December 1994 or January 1995. She became a member of the district attorney's staff in May 1995. During her representation of the appellant, she compiled a case file that she kept at her former office. She testified that she did not bring the appellant's file to the district attorney's office. Roberts testified that other than receiving the notice of the hearing on the motion to recuse, she had not engaged in any discussion with anyone at the district attorney's office regarding the appellant's case. Roberts stated that she understood that she would be prohibited from participating in any manner in the prosecution of a case in which she had previously been involved as defense counsel.
On cross-examination, Roberts testified that her work on the appellant's case had been minimal. In fact, she testified that she had not had any conversations with the appellant.
Bob Burrell, the district attorney, testified that he had not had any conversations with Roberts about the appellant's case, except to note the hearing on the motion to recuse. Burrell testified that other than motions that were filed by Roberts while she was representing the appellant, he had not seen or had access to any notes or documents from the appellant's file.
*291 Paul Matthews, the chief assistant district attorney, testified that he was handling the prosecution of the appellant's case. Matthews testified that other than to inform Catherine Roberts of the hearing on the appellant's motion to recuse, he had not had any discussions with Roberts about the appellant's case. He said that Roberts had told him that she had the appellant's case file, as alleged in the motion to recuse; however, they did not discuss the contents of the case file.
As noted, every member of the district attorney's staff testified at the hearings on the motion to recuse. Their testimony was consistent with Roberts's, Burrell's, and Matthews's.
In the case of Weaver v. State, 678 So.2d 260 (Ala.Cr.App.1995), rev'd on other grounds, 678 So.2d 284 (Ala.), after remand, Weaver v. State, 678 So.2d 292 (Ala. Cr.App.1996), this Court addressed a similar situation:
"The appellant argues that the district attorney's office should have recused from this case because one of the assistant district attorneys had represented Whitmore [a codefendant] before the attorney was employed by the district attorney's office. In Jackson v. State, 502 So.2d 858 (Ala.Cr.App.1986), an assistant district attorney had represented the defendant before joining the district attorney's office. This court found that no actual conflict of interest existed because the lawyer did not bring any of the defendant's records with him to the district attorney's office, he did not discuss the defendant's case with anyone at the district attorney's office, he did not participate in the prosecution of the defendant, and his representation of the defendant occurred before his employment at the district attorney's office.
"`In Hannon [v. State, 48 Ala.App. 613, 266 So.2d 825 (1972)], the defendant conferred with a public defender who was later elected District Attorney. The District Attorney, however, did not take part in prosecuting his former client and did not give his assistants any information derived from conversations with the defendant. We affirmed this conviction, finding no breach of the attorney-client relationship.'
"Terry v. State, 424 So.2d 710 (Ala.Crim. App.1983[(1982)]).
"It does not appear that the assistant district attorney who had previously represented Whitmore participated in his prosecution or revealed any information regarding the appellant's case to anyone in the district attorney's office. His representation of Whitmore occurred prior to his employment with the district attorney's office. We do not see how the appellant was prejudiced in this regard. The trial court correctly denied the appellant's motion to require the district attorney's office to recuse."
678 So.2d at 274-75. See also Smith v. State, 639 So.2d 543 (Ala.Cr.App.1993).
In this case, the evidence established that Roberts "did not bring any of the [appellant's] records with [her] to the district attorney's office, [she] did not discuss the [appellant's] case with anyone at the district attorney's office, [she] did not participate in the prosecution of the [appellant], and [her] representation of the [appellant] occurred before [her] employment at the district attorney's office." Weaver, 678 So.2d at 274. Accordingly, the trial court correctly denied the appellant's motion to require the district attorney's office to recuse.

XXIII.
There is no merit to the appellant's assertion that the trial court erred to reversal in failing to sua sponte order a change of venue. While there may have been some media coverage of the case, and while some of the veniremembers admitted that they had some knowledge of the case, there were no grounds to warrant a change of venue. See Hyde v. State, 778 So.2d 199 (Ala. Cr.App.1998); Stewart v. *292 State, 730 So.2d 1203, 1212 (Ala.Cr.App. 1997), for a thorough discussion of what a defendant must show in order to succeed on a motion for a change of venue. No plain error occurred in the trial court's failure to sua sponte order a change of venue.

XXIV.
The appellant is due no relief on his allegation that the "double counting" of robbery as an element of the capital offense and also as an aggravating circumstance violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution and his rights under Alabama law. This issue has previously been decided adversely to the appellant. See Roberts v. State, 735 So.2d 1244 (Ala.Cr.App.1997); Hagood v. State, 777 So.2d 162 (Ala.Cr.App.1998); Smith v. State, 756 So.2d 892 (Ala.Cr.App.1997); Price v. State, 725 So.2d 1003 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998).

XXV.
The appellant claims that "[t]he death penalty was sought and imposed in this case because of the race and status of the victim." (Appellant's brief, p. 88.) Specifically, he alleges that "[i]f the victim in this case were poor and black, [he] would not have been sentenced to death." (Appellant's brief, p. 88.) The appellant cites absolutely no factual support for this assertion. There is no merit to this claim, and it does not warrant further discussion.

XXVI.
For the first time on appeal, the appellant claims that "[t]he Alabama statute limiting court appointed attorneys' fees to one thousand dollars for out-of-court work for each phase of trial is deplorable and unconstitutional." (Appellant's brief, p. 89.) The appellant is due no relief on this claim. This Court has previously reviewed this assertion and decided it adversely to the appellant. See Hyde v. State, supra, and cases cited therein.

XXVII.
There is no merit to the appellant's contention that Alabama's method of execution by electrocution constitutes cruel and unusual punishment. See Smith v. State, 756 So.2d 892 (Ala.Cr.App.1997); Smith v. State, 727 So.2d 147 (Ala.Cr.App. 1998), and cases cited therein.

XXVIII.
As discussed in part XX of this opinion, the appellant knowingly waived his right to a sentencing hearing before the jury that convicted him. He now alleges that his death sentence should be reversed because it was rendered without the benefit of a jury's recommendation as to the appropriate sentence. Specifically, the appellant argues that Alabama's capital sentencing statute is unconstitutional because it does not "adequately guide trial courts in sentencing without a jury recommendation." (Appellant's brief, p. 92.) The appellant did not present this argument to the trial court.
Alabama law specifically provides that a defendant in a capital case can waive his right to a sentencing hearing before a jury. See § 13A-5-44(c) and 13A-5-46(a), Code of Alabama 1975. Section 13A-5-46(a) provides that in the event a defendant waives his right to a sentencing hearing before a jury "the trial judge shall proceed to determine sentence without an advisory verdict from a jury." Section 13A-5-47, Code of Alabama, specifies how the trial court should proceed to determine the appropriate sentence. Specifically, § 13A-5-47, Code of Alabama 1975, reads:
"(a) After the sentence hearing has been conducted, and after the jury has returned an advisory verdict, or after such a verdict has been waived as provided in Section 13A-5-46(a) or Section *293 13A-5-46(g), the trial court shall proceed to determine the sentence.

"(b) Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.
"(c) Before imposing sentence the trial court shall permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case. The order of the arguments shall be the same as at the trial of a case.
"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 135-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it.
"(e) In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
(Emphasis added.)
The appellant's assertion is without merit. As evidenced from the above, the trial court is given very specific guidance about how to determine a defendant's sentence, with or without a jury's recommendation. Furthermore, in this case, as discussed in Parts XX and XXI of this opinion, the trial court carefully and conscientiously complied with § 13A-5-47, Code of Alabama 1975, in determining that death was the appropriate sentence.

XXIX.
In his last allegation, the appellant claims that "the cumulative effect of all the above listed claims of error entitles [him] to a new trial and sentencing hearing." (Appellant's brief, p. 93.) There is no merit to this assertion. "`Because no single instance of alleged improper conduct constituted reversible error, this Court will not consider the cumulative effect to be greater error. McNeely v. State, 524 So.2d 375 (Ala.Cr.App.1986); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App.1989).' Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App.1993), aff'd, 630 So.2d 125 (Ala.1993)." Boyd v. State, 715 So.2d at 851.

XXX.
Section 13A-5-53, Code of Alabama 1975, mandates that in addition to reviewing the case for any error involving the appellant's capital murder conviction, this Court must review the propriety of the death sentence.
"This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating *294 circumstances were supported by the evidence, and whether death was the proper sentence in the case."
Section 13A-5-53(a).
Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, whether or not brought to our attention or to the attention of the trial court. We find no plain error in either the guilt phase or in the sentencing phase of the proceedings.
The trial court found the existence of two aggravating circumstances: that the appellant has been previously convicted of three felonies involving the use or threat of violence to another person, and that the murder was committed while the appellant was engaged in the commission of a robbery or an attempt thereof. §§ 13A-5-49(2) and (4), Code of Alabama 1975. The trial court found no statutory mitigating circumstances. The trial court found the existence of one nonstatutory mitigating circumstance. Specifically, the trial court found:
"The defendant has offered no testimony or other evidence about his character. The Court notes from the testimony at trial that, at the time of the crime, the defendant was married to Vicki Drinkard and had an adopted daughter, Kelly Drinkard Harville, who is now married. The fact that the defendant is apparently married, has an adopted daughter and perhaps other children is considered by the Court as a mitigating circumstance. However, this circumstance is entitled to very little weight in determining the appropriate punishment to impose in this case."
(C.R.71.)
The trial court's findings reflect that it carefully weighed the aggravating and mitigating circumstances before sentencing the appellant to death. The trial court's findings are supported by the record.
Accordingly, because we find no plain error in either the guilt or the sentencing phase of the appellant's trial, and because we find that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record, we must now determine whether death was the proper sentence. § 13A-5-53(a), Code of Alabama 1975. In so doing, § 13A-5-53(b), requires this Court to determine:
"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
"(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
We find no evidence that the appellant's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. Last, considering both the crime committed and the appellant, we find that the appellant's sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. Indeed, "two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of robbery-murder." McNair v. State, 706 So.2d 828, 845 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998).
Accordingly, the appellant's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
NOTES
[1] At the time of the appellant's trial in August 1995, Rule 19.3(a)(1) read:

"In any prosecution for a capital felony, upon the consent in open court of the defendant, defendant's counsel, and the district attorney, the trial court, in its discretion, may permit the jury trying the case to separate during the pendency of the trial, whether the jury has retired or not."
(Emphasis added.)
Section 12-16-9, Code of Alabama 1975, as amended effective June 15, 1995, provides, in relevant part:
"In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial."
Rule 19.3(a)(1), Ala.R.Crim.P., has subsequently been amended and "effectively follows § 12-16-9 as it now exists." See Committee Comments to Rule 19.3, Ala.R.Crim.P.
[2] It is not clear whether the appellant's motion was timely filed.

Rule 12.9, Ala.R.Crim.P., provides:
"(a) Procedure. The grand jury proceedings may be challenged only by written motion to dismiss the indictment, filed in the circuit court and alleging grounds therefor.
"(b) Timeliness. A motion under section (a) of this rule may be filed after an indictment is returned and before arraignment or by such later date as may be set by the court; provided, however, that if counsel is appointed for the first time at arraignment, the court shall give counsel a reasonable time within which to file the motion."
The appellant was arraigned on January 6, 1994. (C.R. 47; Vol. 4, R. 19.) At arraignment, the trial court stated that it would give the appellant at least an additional 30 days to file what should have been pre-arraignment motions. The case action summary sheet contained in the record indicates that on February 9, 1994, more than 30 days after arraignment, the appellant filed a motion styled, "Motion for Additional Time to File Pre-Arraignment Motions." (C.R.74.) The record does not indicate the disposition of this motion. On February 17, 1994, the appellant filed the motion to dismiss the indictment that is the subject of this appeal. Apparently, the trial court treated the appellant's motion to dismiss as timely filed. Accordingly, we will treat the motion as timely filed.
[3] We also found several other instances of reversible error.
[4] The Code Commissioner's Note to this section notes that "Rules 601 and 609 of the Alabama Rules of Evidence ... supersede this section, effective January 1, 1996." The Alabama Rules of Evidence became effective after the appellant's trial, which was conducted in August 1995.
[5] "As provided in Rule 18.4(g)(3), A.R.Crim. P., `The last person or persons struck shall be the alternate or alternates....' Thus, the trial court should view the alternate jurors as having been struck for purposes of Batson and this court must `evaluate the State's explanation for striking [the alternate].' Ex parte Bankhead, 625 So.2d 1146, 1147 (Ala.1993)."

Ashley v. State, 651 So.2d 1096, 1099 (Ala.Cr. App.1994).
[6] We note that the autopsy photographs were not initially included in the record on appeal. It is the appellant's duty to ensure that the record is complete; however, because the death penalty has been imposed in this case, this Court requested that the photographs be transmitted to this Court so that we could be review them.
[7] The appellant did object to Officer Walker's testifying to what he heard the appellant tell Robinson on the ground that the tape itself was the best evidence of the conversation. The trial court properly overruled this objection. See, C. Gamble's, McElroy's Alabama Evidence, § 200.19 (5th ed.1996). ("Oral testimony relating a confession would be admissible, over a best evidence rule objection, despite the fact that there exists a tape recording or videotape of the confession. This results from the fact that the best evidence rule applies to writings only.")
[8] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).